THIRD DIVISION
September 22, 2010

No. 1-08-2839

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 03 CR 22256 (01) |
| | ) | |
| DANIEL JIMERSON, | ) | Honorable Domenica A. Stephenson, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE MURPHY delivered the opinion of the court:

Following a simultaneous but severed jury trial with codefendant Karl Askew[1], defendant, Daniel Jimerson, was found guilty of four counts of aggravated battery to a peace officer (720 ILCS 5/12-4(b)(6) (West 2006)) and one count of mob action (720 ILCS 5/25-1(a)(1) (West 2006)). The convictions related to a July 27, 2003, jail melee allegedly started by defendant. The incident involved several detainees, including Askew, defendant's cell mate, and numerous correctional officers.

Defendant was sentenced to 10 years' imprisonment on the aggravated battery to a peace officer convictions and 6 years' imprisonment on the mob action conviction, to be served

---

[1] Codefendant Askew also was found guilty and has filed an appeal of his convictions that is currently pending before this court. *People v. Askew*, No. 1-08-2951.

No. 1-08-2839

concurrently. On appeal, defendant contends that: (1) he was denied a fair trial because the judge exhibited bias against him; (2) the trial court failed to properly instruct the jury on the issue of self-defense; and (3) pursuant to the one-act, one-crime rule, his conviction for mob action should be reversed because it was based on the same operative facts as his convictions for aggravated battery to a peace officer. Alternatively, defendant argues that his extended-term sentence of six years' imprisonment for mob action must be reduced to the maximum authorized by statute for a Class 4 felony, or three years' imprisonment. For the reasons that follow, we affirm in part and reverse in part.

## I. BACKGROUND

Following opening arguments, the State opened its case with the testimony of correctional Officer Van Porter, a six-year veteran of the sheriff's department. Porter testified that he is assigned to division 11 of the Cook County jail, West 31st Street and South California Avenue, Chicago, Illinois. Correctional officers all wear uniforms that consist of pants, shirt, boots, belt, and badge, and carry handcuffs and a three-inch flashlight. Officers are not allowed to bring any weapons onto the jail tiers and are searched prior to entering into the facility. Each officer is assigned a two-way radio for use during an eight-hour shift. However, the radios are turned in to be charged with about an hour remaining on the shift because the facility does not have enough radios.

Porter described the building as separated into four pods, each consisting of four tiers of jail cells. On July 27, 2003, Porter was the sole officer assigned to tier AB for his 3 p.m. to 11 p.m. shift and was in charge of the 22 detainees in that tier. Porter testified that detainees on this

2

tier were in their locked jail cell for 23 hours and allowed out for 1 hour each day. The detainees were on rotated schedules from day to day, though some detainees that were more reliable were selected to assist in cleaning and feeding tasks and were allowed out of their cells for longer times. During the hour out of their cells, they were free to walk through the tier, use the telephone, shower, speak to other detainees, or use the washroom. Access to the cells may be opened only by an officer in a pod control room. If an officer on the tier desired to enter a cell, a button was pressed and the officer in the pod control room then electronically opened the cell door. The pod control room door was always closed and the pod officer could not hear yelling from the tier.

On July 27, 2003, detainees Tony Echols, Reginald Flemister and Rufus Williams were selected to work the tier during Porter's shift. At approximately 8:30 p.m., Porter had detainee Dion Coleman released from his cell in order to be transferred off the tier. Under standard transfer procedure, with the assistance of Officer Antonio Rubino from tier AC, Coleman was searched and found to possess contraband. Porter returned Coleman to his cell on tier AB and Porter then completed a disciplinary report.

After Porter completed the disciplinary report, Rubino delivered a copy of the report to Coleman. When Rubino returned to the office, he asked Porter how many detainees were out of their cells working. When Rubino told Porter that four detainees were out of their cells instead of three, Porter looked inside the tier and saw Echols, Flemister and Williams working and defendant was on the telephone.

Porter testified that Rubino accompanied him back to tier AB. As they approached

defendant, he hung up the phone and Porter asked defendant what he was doing. Defendant responded "I had to use the phone. Do what you have to do." Porter told defendant to "lock up," which he explained meant returning the detainee to his cell to be locked up. At this time, Rubino turned and took the lead to get defendant's cell door open, and defendant followed Rubino with Porter in the rear.

Before they reached defendant's cell, defendant yelled "take your stand" and raised his arms about shoulder length high and out. At that point, "a few" cell doors started to open. Porter testified that defendant turned and hit the left side of Porter's face with his right fist. Defendant then "dove down and grabbed [Porter] by the waist" and detainee Nikitus Cross attacked Porter, punching him on the left side of his body while defendant maintained hold of Porter's waist. Porter punched back against both defendant and Cross in an attempt to defend himself.

Porter testified that he saw detainees Karl Askew, Gregory Ashford, and Terry Boyd exit their jail cells and attack Officer Rubino. The three detainees authorized to be out of their cells, Echols, Flemister and Williams, also joined in the attack against Rubino. Rubino remained standing and absorbing blows until Williams hit him in the back of the head with a gray storage bin and he fell to the ground. The detainees continued to attack Rubino as he lay on the ground.

Porter testified that both he and Rubino had turned in their radios for the night to be charged for the next shift. The only way to try and contact the pod control officers was to try and yell. Therefore, it was two to three minutes until additional officers arrived to defuse the situation. Porter testified that Officer Bernando Lopez was the first to arrive.

Porter testified that when Lopez arrived, he saw detainee Gregory Ashford strike Lopez

4

with his fists. Porter testified that eventually 20 officers arrived after Lopez and they gained control of the tier. After the eight detainees involved in the attack were taken to Cermak Hospital, which is located at the jail, Porter also received medical treatment. No medical records were presented, but Porter testified that he suffered a swollen jaw and bruised left ribs. Porter returned to work the following day, but did not return to tier AB.

Officer Rubino testified that on the night of July 27, 2003, he was assigned to tier AC, located across from tier AB. Rubino knows that Porter was assigned to tier AB because he was his "cross watch" that night, meaning they covered each other in the event of problems, lunch relief or the like. Rubino also testified that he turned in his radio at 9:30 p.m. At about 10:30 p.m., after serving Coleman the disciplinary report, he informed Porter that four detainees were out of their cells. Rubino testified that as he and Porter approached, defendant hung up the phone and Porter instructed him to return to his cell to lock up because he was in an unauthorized area. Defendant responded that he was not going to lock up and told Porter "to do what you got to do."

Rubino testified consistently with Porter that he led the three back toward defendant's cell, though he was later impeached with his grand jury testimony that defendant was by the telephone when he yelled "take your stand." He testified that after defendant yelled this and the cells opened, Askew, Williams, Flemister, and Echols attacked him, punching and kicking him numerous times before he was struck in the back of his head with a gray storage bin that caused him to fall to the ground. Rubino testified that several minutes after the attack began, Officers Lopez and Michael Masters arrived and they were also attacked by the detainees.

Rubino testified that after the situation was brought under control with the arrival of 15 to 20 officers, he wrote his incident report and then sought medical care at Cermak Hospital. He testified that he was found to have suffered a concussion. Rubino testified that he also sought treatment from his private physician and had a CAT scan because he was having periodic headaches. Rubino returned to work the next day and was assigned tier AB.

Officer Lopez testified that at approximately 10:45 p.m. on the night of July 27, 2003, he was assigned to tier AA and heard yelling and screaming from tier AB. He looked through windows to see Officers Porter and Rubino being attacked by eight detainees. Lopez alerted the pod control officer to send out an "all available" message to request all available officers for backup and entered tier AB to assist. Upon entrance to the tier, Lopez was attacked by Ashford and Boyd. Lopez defended himself by returning punches.

After about two to three minutes Officer Masters arrived and Lopez told him to send out an "all available." Masters immediately left and returned shortly thereafter to the tier. Lopez testified that he told the detainees to get down, but they did not comply and he was immediately attacked by several detainees. Lopez struck back, but after five or more minutes, he just covered up and tried to limit injuries. Eventually, additional officers arrived, screamed commands and gained control of the situation by handcuffing the detainees.

Lopez went to Cermak Hospital after the incident with injuries to his back, knee, head, and shoulder. Lopez testified that he lost 10% range of motion in his left shoulder. Lopez followed up with his private physician for treatment. As a result of the injuries suffered, he missed four to five months of work. No medical records related to Lopez's injuries were

6

No. 1-08-2839

introduced.

Officer Masters testified that on the night of the incident he was assigned to tier AD, which is located down the hall, approximately 50 feet from tier AB. At approximately 10:30 or 10:45 p.m., Masters was filing paperwork in the sergeant's office, which is located in the center of the pod. When he heard yelling and screaming coming from tier AB, Masters ran to the window and saw detainees attacking Officers Rubino, Lopez and Porter, and he buzzed the door to gain entry. When he gained entry, Lopez screamed at Masters to "call an all available, call an all available."

Masters testified that he returned to the middle core of the pod and yelled up the stairs to the pod officer to call an "all available" and then ran back to tier AB to assist the officers in distress. Masters testified that defendant, Williams, and Ashford were attacking Officer Rubino at the time and then turned to attack him and he was knocked to the ground and hurt his knee. Though it "seemed like forever," Masters testified he was repeatedly punched by the detainees for 5 to 10 minutes before other officers arrived and stopped the fighting. Masters testified that he sustained injuries to his right arm and right wrist. He also sustained a torn meniscus disc and patella tendon to his left knee that required surgery. Masters testified that he was out of work for 1.5 years and continues to suffer from arthritis in his knee. No medical records were introduced.

Officers Tommy Hall and James Hession testified that they were among the large group of officers that responded to the "all available" call over the public address system and helped end the altercation. Hall testified that he saw defendant strike Porter. Hession testified that he assisted three other officers in securing and handcuffing defendant. Neither Hall nor Hession

7

was struck in the incident.

Sergeant John Manos testified that he was a supervisor at Cook County Jail in the B pod at the date and time of the instant incident. Manos was in the shift commander's office for the B pod when he responded to the call of a disturbance on the lower A pod. When Manos arrived on the scene, he saw approximately 20 officers with 8 detainees who were out of their cells. The detainees were all handcuffed and located in the dayroom, either on the ground or standing. Manos testified that Officer Rubino was holding his head and Officer Lopez was having difficulty breathing and his shirt had been ripped open. Other inmates in the tier remained in their cells.

Manos testified that Superintendent Michael Holmes arrived and they inspected the open jail cells. They identified items in the locking mechanisms and frames of the cell doors where the locks were supposed to engage. The items found were pieces of playing cards, pieces of plastic from deodorant dispensers, pen caps and a bottle cap. Manos testified that he and Holmes then searched the remaining cells and found the doors similarly obstructed. Holmes testified consistently with Manos.

Defendant testified as the only witness on his behalf. Defendant testified that on the night of the incident, Officer Porter was bringing detainee Coleman back to his cell when defendant asked if he could use the phone. Porter told defendant to wait a minute and then exited the tier. Defendant testified that he heard the locking mechanism of his cell door disengage so he opened the door and defendant saw that detainees Echols, Flemister, and Williams were out of their cells and working the dayroom. Defendant did not see any officers so he went to use the phone. After

he used the phone, defendant saw Officer Rubino enter the tier and then exit.

Defendant testified that he next saw Officers Rubino and Porter. Porter gestured to defendant to approach them. Porter asked why defendant was not in his cell. Defendant stated that he was "out bogus," out of his cell without permission, at which point Porter told him to accompany them into the multipurpose room. Defendant testified that Porter put on a pair of gloves and became aggressive in the multipurpose room. Porter shoved defendant, poked him in the chest and asked why defendant was out of his cell without permission. Defendant testified that he told Porter to write him up and to keep his hands off of him.

Defendant testified that Porter then smacked him in the left side of his face with an open hand. Defendant later admitted that he also alleged in his grievance report that Porter hit him with a closed fist. Defendant stated that he pushed away from Porter and ran out of the multipurpose room and back to tier AB. Defendant testified that he saw that the pod control office door was open, as they often were held open with pool sticks. At this time, Officer Lopez joined Porter and Rubino and chased defendant before Porter was able to do "an old school trip, clip" of defendant from behind. Lopez then struck defendant several times across his back with a pool stick.

Defendant testified that he fought back against the officers and tried to defend himself. He grabbed Porter around the waist to try and avoid getting hit, but Porter and Lopez continued to hit him. Eventually, defendant broke away and ran toward his cell. The three officers stopped defendant from closing the cell door and began to strike defendant and his cell mate, codefendant Askew, with handcuffs around their hands. He testified that the officers dragged him and Askew

out of their cell. They eventually got loose again and ran into Ashford and Cross's cell. Defendant picked up Ashford's gray property box and held it up toward the officers. When Porter attacked defendant by tackling him, defendant threw the property box at Porter.

After the other officers responded to the "all available" call, defendant and the other detainees were subdued, handcuffed and brought to the nurse. Defendant testified that his hands and forehead were bruised and he had a stinging sensation from the back where Lopez hit him with the pool stick. When the nurse informed defendant that his back was bleeding, defendant stated that he looked and noticed "splinters inside of my back." At Cermak Hospital, he was treated, cleaned up, and nurses removed splinters from his back.

Defendant admitted that he had been convicted of two drug offenses in 1998 and armed robbery in 2005. He also admitted that his testimony differed from the grievance reports that he filed. He testified that he completed the reports two weeks after the incident when he sat down with "some civil lawyers." Defendant also testified that he informed the investigator from the sheriff's office of the course of events as he testified to at trial. The defense rested.

In rebuttal, the State offered additional testimony from Officers Porter, Rubino and Lopez as well as the testimony of Investigator Craig Januchowski. The officers denied defendant's allegation that he asked to use the telephone. They also testified that they did not take defendant into the multipurpose room, put on gloves, or slap or hit him before he threw the first punch. Further they denied chasing, tripping and hitting defendant with a pool stick. They also denied chasing defendant and Askew from one cell into another cell.

Januchowski testified that at the time of the incident he was working within the jail

enforcement unit of the sheriff's office and he investigated the incident at issue. Januchowski interviewed both detainees and correctional officers involved in the incident, including defendant. Januchowski testified that defendant told him that it was easy to open the cell doors and that it happened all the time. Defendant told him that Officer Porter escorted him back to the dayroom and that other detainees opened their cell doors and ran toward him to try and free him from Porter. Defendant also told Januchowski that all the inmates then ran from the dayroom into cell ten.

Following closing arguments, the trial court read the agreed jury instructions on the definition of aggravated battery and the elements required to convict defendant, including language that the State must prove that defendant was not justified in using the force he used. The trial court also read the definitional instruction for justification. The jury found defendant guilty of mob action and aggravated battery to Officers Porter, Rubino, Lopez and Masters. Defendant was sentenced to 10 years' imprisonment for the aggravated battery convictions and 6 years' imprisonment for the mob action conviction, to be served concurrently. Defendant filed a motion for new trial, arguing that the trial judge erred in overruling objections to the prosecutor's cross-examination of him. The motion was denied and this appeal followed.

## II. ANALYSIS

### A. Trial Court Bias and Right to a Fair Trial

Defendant claims that the trial court revealed a bias against him during trial that mandates a new trial. Defendant bases these arguments on the trial court's: (1) admonishments of defendant and defense counsel during the cross-examination of defendant; (2) overruling defense

No. 1-08-2839

counsel's objections to the tone and manner of the prosecutor's cross-examination; and (3) sustaining several objections by the prosecutor during defense counsel's closing argument. Defendant asserts that these actions revealed a clear bias by the trial court against defendant and prejudiced his case before the jury.

The State notes that these issues have been waived because they were not raised in a posttrial motion by defendant. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, when a claim of error involves allegations of improper judicial conduct, the State allows that reviewing courts will relax the waiver rule and review these allegations for plain error. *People v. Hamilton*, 361 Ill. App. 3d 836, 848 (2005). The criminally accused is entitled to a fair and impartial trial by a jury and while the trial court has great discretion in conducting a trial, interjecting commentary or opinions that reflect prejudice against or favor a party is impermissible. This is especially important as jurors are watchful of the court's conduct and it must be careful not to influence the jury by reflecting disbelief in witnesses, an assumption of guilt of the defendant, or undue confidence in the prosecution's witnesses. *People v. Williams*, 209 Ill. App. 3d 709, 718 (1991). Such improper comment or hostility will only rise to reversible error if the defendant can show prejudice and that the comment or hostility was a material factor in conviction. We will not disturb a verdict, but we will find questionable behavior of the trial court harmless error if there is no prejudice or the conduct was not a material factor in the outcome of the trial. *People v. Gossitt*, 259 Ill. App. 3d 825, 832 (1994).

Defendant's first claim of error centers on the following exchange during the State's cross-examination of defendant, which began:

12

"ASSISTANT STATE'S ATTORNEY: Before July 27, 2003, Mr. Jimerson, had your cell door ever popped open before?

DEFENDANT: Never.

ASSISTANT STATE'S ATTORNEY: Never. Just that day, correct?

DEFENDANT: That's right.

ASSISTANT STATE'S ATTORNEY: You're running out of your cell with Karl Askew with those officers in pursuit, and you said you made it to the cell next to you, Ashford and Cross's cell, correct?

DEFENDANT: That's incorrect. I never ran that myself. I told you, I was dragged out my cell by the officers.

ASSISTANT STATE'S ATTORNEY: And they dragged you into the, in to Cross's and Ashford's cell?

DEFENDANT: No, they dragged me into the [dayroom].

ASSISTANT STATE'S ATTORNEY: How you [*sic*] did you get into Cross's cell?

DEFENDANT: Cross cell was already open because he was out for his hour. When the officers was attacking us --

ASSISTANT STATE'S ATTORNEY: Let me stop you there, because in your testimony --

THE COURT: Stop. Stop. You answer only the question asked. Don't add things. Do you understand me, Mr. Jimerson?

13

DEFENDANT: Yes.

THE COURT: Don't say anything other than yes or no.

Do you understand me?

DEFENDANT: Yes, ma'am.

THE COURT: Do you understand? You don't interrupt when other people are talking. One person at a time.

Do you understand [Defense Counsel]?

DEFENSE COUNSEL: I do. May I put an objection on the record?

THE COURT: Yes, you may.

DEFENSE COUNSEL: I would ask that the State not be, not interrupt my client when he is completing an answer.

THE COURT: If your client would only answer the question asked we wouldn't have that problem.

Noted, but overruled.

You may proceed, [Assistant State's Attorney].

ASSISTANT STATE'S ATTORNEY: In your direct testimony, the thing you just did with your lawyer standing here --

DEFENSE COUNSEL: I object to him badgering my client, raising his voice.

THE COURT: [Defense Counsel], he hasn't even gotten the question out.

DEFENSE COUNSEL: He is screaming, Judge.

THE COURT: [Defense Counsel], objection is noted but overruled.

You may proceed.

ASSISTANT STATE'S ATTORNEY: Did you ever volunteer during the direct examination by your lawyer who is asking you the questions that Nikitus Cross was out of his cell and that cell door was already open?

DEFENDANT: I don't understand. Can you repeat the question?

ASSISTANT STATE'S ATTORNEY: I will, absolutely.

During your direct examination when your lawyer is asking you the questions – you follow me so far?

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

ASSISTANT STATE'S ATTORNEY: Are we on the same page?

DEFENDANT: Yes.

ASSISTANT STATE'S ATTORNEY: Did you testify that Nikitus Cross was already out of his cell?

DEFENDANT: Did I testify that?

ASSISTANT STATE'S ATTORNEY: Yes.

DEFENDANT: No, I did not.

ASSISTANT STATE'S ATTORNEY: How about Gregory Ashford? Was he in or out of his cell?

DEFENDANT: He was in his cell.

ASSISTANT STATE'S ATTORNEY: And it is your testimony that –
well, let me ask you.

When you were answering questions by your lawyer, didn't you testify in
front of everyone that you were dragged into that cell, the cell of Nikitus Cross?

DEFENDANT: No.

ASSISTANT STATE'S ATTORNEY: You said you ran into it?

DEFENDANT:  Can I speak?

ASSISTANT STATE'S ATTORNEY: Yes or no?  You said you ran into
that cell?

DEFENSE COUNSEL: Objection, Judge.

THE COURT: Overruled.

DEFENDANT: After I was - -

ASSISTANT STATE'S ATTORNEY: Yes or no?  You ran into that cell,
that's what you testified?  Yes or no?

DEFENDANT: No."

The State's cross-examination of defendant continues from there with numerous inquiries
and properly limited answers by defendant.  Defendant contends that the trial court erred by
chastising him near the beginning of this exchange and repeatedly instructing him to only
respond "yes or no" to questions.  He argues that the transcript clearly shows that the prosecutor
was aggressive and interrupted defendant, not the other way as stated by the trial court.  He
contends that the trial court's comments were further unreasonable because defendant was faced

16

with open-ended questions and not a "yes or no" question.

Defendant argues that his polite responses were ignored and the trial court's tedious and repeated admonishments made him appear uncooperative to the jury. In addition, he maintains that the trial court's actions emboldened the prosecutor to become more aggressive and condescending to defendant. He argues that the trial court's failure to sustain subsequent objections by defense counsel to the badgering condescension of the prosecutor, condoned such an attitude and behavior in the eyes of the jury.

Defendant concludes that this issue was exacerbated by the trial court's courteous treatment of all of the State's witnesses. Further, the State argued against the credibility of defendant in closing argument and rebuttal argument. The prosecutor questioned the believability of defendant's testimony that the doors "conveniently" opened when defendant needed it. Defendant maintains that several of the State's witnesses testified that certain doors were open and defendant's testimony was not so incredulous as the trial court allowed the State to argue.

Finally, defendant contends that the trial court further compromised his right to a fair trial by sustaining several objections by the State to defense counsel's closing argument. Defendant points out that, like the State, defense counsel is allowed great latitude during closing argument and may comment on the evidence presented and make reasonable inferences therefrom. *People v. Weatherspoon*, 63 Ill. App. 3d 315, 322 (1978). He argues that when the trial court sustained numerous unexplained objections, it foreclosed his counsel's opportunity to do just that.

In particular, defendant claims that the trial court improperly sustained objections to

counsel's arguments that: the control officer could hear shouting; Officer Staniszewski - the pod control officer "that could have heard the shouting" - was not brought in by the State; detainees knew that once an "all available" was called a bunch of officers would arrive; defendant knew force would be used on him and he would be handcuffed if an "all available" was called; defendant was "five-nine, a hundred and eighty pounds"; defendant knew what would happen after he struck an officer; and there was a question why the three working detainees became involved.

We agree with the State that these alleged errors were not a material factor in defendant's convictions and did not prejudice him. The initial exchanges during the State's cross-examination did not evidence a bias or improperly support the State. We agree that the trial court's admonishment to defendant to answer all questions "yes or no" was improper. However, based on the record, not only was this apparently a simple case of the trial court misspeaking, but there was no prejudice as a result. Defendant appeared to understand as his remaining testimony included proper "yes or no" answers or further explanations when warranted and the parties did not talk over each other, as admonished. It is impossible to tell if or how the prosecutor was yelling during this questioning, but the exchanges that followed did not evidence any lingering animosity or inappropriate behavior. Defendant requested clarification when needed and the prosecutor broke down difficult questions for him.

As the State points out, objections were sustained during the presentation of the State's witnesses. In particular, the State points to the trial court's admonishment to Officer Lopez to only answer the question asked in sustaining an objection to a voluntary statement. Other

examples of equal treatment are available in the record. It cannot be said that there was such disparate treatment between the two sides to support a claim of bias.

Finally, the trial court's sustaining the State's objections during closing arguments did not prejudice defendant either. In considering each of defendant's claims, a review of the record supports the State's claim that each objection was properly sustained because the comment was not based on evidence presented at trial. Nor were the comments reasonable inferences that could be drawn from the evidence. Accordingly, defendant was not prejudiced and the allegedly improper conduct of the trial court was not a material factor in his convictions.

### B. Jury Instructions

Next, defendant contends that the trial court failed to properly instruct the jury on the charges of aggravated battery. Specifically, defendant claims the trial court erred by not instructing that the State was required to prove beyond a reasonable doubt that defendant was not legally justified in using force. Defendant contends that he has raised an issue of the correctness of the Illinois Pattern Jury Instructions, a pure question of law that requires *de novo* review. *People v. Krueger*, 175 Ill. 2d 60, 64 (1996).

Defendant notes that it is reversible error when a court fails to instruct the jury of the State's burden of disproving beyond a reasonable doubt a defendant's affirmative defenses of self-defense and defense of others. *People v. Brophy*, 96 Ill. App. 3d 936, 942 (1981). The parties agree that the trial court properly instructed the jury orally on all issues. However, the clean written instructions in the record, those sent with the jury for deliberations, do not contain these instructions. Therefore, defendant argues, the jury was faced with critical inconsistencies

19

in instructions that impeded it from performing its vital constitutional function. *People v. Jenkins*, 69 Ill. 2d 61, 66-67 (1977).

The State asserts that this matter was forfeited by defendant's failure to object at trial and to raise the issue in his posttrial motion. *Enoch*, 122 Ill. 2d at 186. The State continues to argue that defendant's claim should not be saved by the plain error rule as the evidence was not closely balanced and there was no substantial error affecting fundamental fairness. See *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Defendant asserts that this claim should not be considered forfeited as it is an error that could not be discovered on appeal. We agree with defendant that this alleged issue should not be considered forfeited as it, as alleged, could not have been objected to at trial and was only discoverable on appeal.

However, we agree with the State that we must view the record as a whole to resolve the inconsistency between the record and the transcript of proceedings. We also must start with the presumption that the trial court acted correctly in a situation such as the instant issue. See *People v. Durr*, 215 Ill. 2d 283, 306 (2005); *People v. Jones*, 196 Ill. App. 3d 937, 960 (1990). The record supports the State's claim that the error was only discovered on appeal because it was merely an error in compiling the record and not a trial error violating the tenets of fundamental fairness.

In coming to this conclusion, the State points to the record in the pending related appeal of codefendant Askew and respectfully requests this court take judicial notice of that record on appeal. Though the State does not provide authority for such a request, we note that a reviewing court may take judicial notice of public records and other judicial proceedings. *People v. Davis*,

No. 1-08-2839

65 Ill. 2d 157, 164-65 (1976). Therefore, we have undertaken a review of the record in *People v. Askew*, No. 1-08-2951, in resolving this issue.

As highlighted by the State, it is important to first recall that there is no dispute that the trial court properly gave oral instructions to the jury. After the jury was read the proper oral instructions by the trial court and sent to the jury room for deliberations, the court noted to counsel that there was a typographical error on one of the clean instruction sheets to be given to the jury. Defense counsel considered the error and had no objection to that form being sent to the jury. The proposed instruction of record on this issue in this case contains that typographical error, but the proposed instruction in *Askew* does not contain that error. Neither record on appeal contains a complete set of clean instruction sheets or the clean instruction containing the typographical error. In addition, the record in *Askew* contains all of the clean not guilty verdict forms for defendant. The State highlights that defendant does not argue that the jury did not receive these forms.

A review of the records in both of these appeals supports a finding that the jury received the proper forms during deliberations. The record indicates the deputy sheriff informed the court he would get them and then the court stated that the forms were in order before the verdict was read. Therefore, the record supports the conclusion that the jurors accidentally left some clean instructions in the jury room after they were brought out with their verdict.

Finally, we add that the records indicate that the Askew jury was instructed and sent to deliberate before the State presented its rebuttal witnesses and closing arguments. During the discussion of the typographical error and before the forms were given to the jury in this case, the

21

trial court noted that a verdict had been reached by the Askew jury. The report of proceedings and actions of the parties lead this court only to the conclusion that the jury was properly instructed orally and given the proper written instructions. Any alleged error was not in submission of the forms to the jury by the trial court, but in the transmittal of the forms following deliberations or the assembly of the record. Therefore, we conclude that the record does not support defendant's claim that he was prejudiced by improper jury instructions.

### C. One Act, One Crime

Finally, defendant argues that his conviction and sentence for mob action must be vacated based on the one-act, one-crime rule. *People v. Crespo*, 203 Ill. 2d 335 (2001). Under the one-act, one-crime rule, a defendant may be convicted for one crime resulting from a single act. *People v. Dresher*, 364 Ill. App. 3d 847, 863 (2006). Defendant asserts that the trial court based its sentencing upon the multiple convictions for the same act and that case law clearly requires that the lesser charge must be vacated. *People v. Lee*, 213 Ill. 2d 218, 226 (2004). Our review of this issue is *de novo*. *Dresher*, 364 Ill. App. 3d at 863.

Defendant argues that the conviction for mob action is based on the same physical act as his convictions for aggravated battery. He contends that there was no apportionment of the charges among the strikes with his hands and feet. He argues that he therefore was convicted twice under different theories of culpability for the same conduct of striking the officers and, under *Crespo*, the failure to apportion crimes and conduct requires reversal. *Crespo*, 203 Ill. 2d at 346. Defendant contends that, despite defense counsel's failure to object to or raise this issue in a posttrial motion, it should be considered under the plain error doctrine. *Herron*, 215 Ill. 2d

at 186-87. Alternatively, defendant contends that his sentence for the mob action conviction should be reduced to three years' imprisonment because the trial court was only authorized to impose an extended-term sentence to the most serious class of offense. 730 ILCS 5/5-8-2(a) (West 2006); *People v. Jordan*, 103 Ill. 2d 192, 205-06 (1984).

The State does not argue waiver, but maintains that the indictment in this case properly apportioned the offenses between the victims and actions of defendant. The State argues that *Crespo* is inapplicable to this case and that *People v. Dixon*, 91 Ill. 2d 346 (1982), is on point and supports affirming defendant's convictions. The State points out that the main concern for the *Crespo* court was the attempt, on appeal, to apportion the actions of the defendant to several crimes. *Crespo*, 203 Ill. 2d at 342-44. We agree with the State that *Dixon* is applicable and, unlike in *Crespo*, the State did not attempt to change course on appeal.

In *Dixon*, the defendant and at least one codefendant violently and repeatedly struck another inmate with broom or mop handles in a tier of the DuPage County jail causing multiple contusions, abrasions and a groin injury to the victim. *Dixon*, 91 Ill. 2d at 349. In denying the defendant's claim that his convictions for aggravated battery, mob action, and disorderly conduct were predicated upon a single act, our supreme court affirmed the definition of " 'act' " as " 'any overt outward manifestation which will support a different offense.' " *Dixon*, 91 Ill. 2d at 355, quoting *People v. King*, 66 Ill. 2d 551, 566 (1977). The *Dixon* court concluded that the evidence indicated that the defendant struck the victim at least four or five times and, though closely related, they were not one physical act and supported multiple convictions. *Dixon*, 91 Ill. 2d at 356.

23

As the State argues, it sought convictions for mob action and aggravated battery to a police officer based both on defendant's own actions and under an accountability theory. The jury was properly instructed under both theories of defendant's culpability. A conviction for mob action requires proof that the individual, and at least one other person, acted together, without legal authority, with the use of force or violence to disturb the peace. 720 ILCS 5/25-1(a)(1) (West 2006); *People v. Davison*, 236 Ill. 2d 232, 243 (2010). The evidence at trial supported a finding that defendant was guilty of all charges as he and the other detainees worked in concert with force and violence to disturb the public peace and struck each of the officers as alleged, at least one time.

The evidence presented at trial indicated that defendant verbally and physically started the incident, inciting and leading the other detainees. Testimony showed that defendant struck Porter more than one time and also grabbed him around the waist so that other detainees could continue to strike him. Further, testimony indicated that Officers Rubino, Lopez and Masters were also struck repeatedly by the other detainees involved in the incident.

Therefore, under *Dixon*, the multiple strikes are separate acts. The State proceeded under such a theory, presented evidence in support and sought to instruct the jury under this theory. Unlike in *Crespo*, there has not been a change in position to defendant's detriment. Further, the *Crespo* court specifically discussed *Dixon* and *King* and did not disturb those rulings, but distinguished the facts of that case. The evidence at trial was sufficient to prove that defendant, and those he was accountable for, committed several acts in support of each of defendant's convictions.

No. 1-08-2839

Finally, the State concedes defendant's alternative argument concerning his sentence. Defendant argues that his sentence for mob action must be reduced to three years' imprisonment because the trial court was only authorized to impose an extended-term sentence for the most serious class, the aggravated battery conviction. Aggravated battery is a Class 3 felony, while mob action is a Class 4 felony with a maximum sentence of three years' imprisonment. 730 ILCS 5/5-8-1(a)(7) (West 2006). Accordingly, we hold that the trial court abused its discretion in imposing an extended-term sentence on the mob action conviction since that offense was not within the most serious class of offenses for which the defendant was convicted.

### III. CONCLUSION

For the foregoing reasons, we affirm defendant's convictions and reverse the extended-term sentence imposed on the mob action conviction and reduce it to three years, the maximum sentence of imprisonment authorized by statute for a Class 4 felony. 730 ILCS 5/5-8-1(a)(7) (West 2006).

Affirmed in part and reversed in part.

QUINN, P.J., and STEELE, J., concur.

No. 1-08-2839

| | **REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT** |
|---|---|
| Please Use Following Form: | **(Front Sheet to be Attached to Each Case)** |
| Complete TITLE of Case | **THE PEOPLE OF THE STATE OF ILLINOIS,** <br><br> **Plaintiff-Appellee,** <br><br> **v.** <br><br> **DANIEL JIMERSON,** <br><br> **Defendant-Appellant.** |
| Docket No. <br><br> COURT <br><br> **MODIFIED upon rehearing** Opinion Filed | **No. 1-08-2839** <br><br> **Appellate Court of Illinois** <br> **First District, THIRD Division** <br><br> **September 22, 2010** <br> (Give month, day and year) |
| JUSTICES | **JUSTICE MURPHY delivered the opinion of the court:** <br><br> **Quinn, P.J. and STEELE, J.,** concur [s] <br><br> dissent[s] |
| APPEAL from the Circuit Ct. of Cook Cty; <br><br> The Hon. _____, Judge Presiding. | Lower Court and Trial Judge(s) in form indicated in the margin: <br><br> The Honorable **Domenica A. Stephenson** , Judge Presiding. |
| For APPELLANTS, John Doe, of Chicago. <br><br> For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel) <br><br> Also add attorneys for third-party appellants or appellees. | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented. <br><br> Attorneys for Appellant: Michael J. Pelletier, Deputy Appellate Defender <br> Patricia Unsinn, Deputy Defender; Jessica A. Hunter, Asst. Appellate Defender <br> 203 N. La Salle Street, 24th Floor, Chicago, IL 60601 <br> Phone: (312) 814-5472 <br><br> Attorneys for Appellee: Anita Alvarez, Cook County State's Attorney <br> Alan J. Spellberg, Ashley A. Romito, Jessica R. Ball, Asst. State's Attys., Of Counsel <br> Room 309, Richard J. Daley Center, Chicago, IL 60602 <br> Phone: (312) 603-5496 |