2020 IL App (1st) 162395-U

SIXTH DIVISION
MARCH 13, 2020

No. 1-16-2395

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 1631 (03) |
| | ) | |
| GONZALO GUERRERO, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Mikva and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The defendant's convictions are affirmed, as the State proved him guilty beyond a reasonable doubt and his convictions do not violate the one-act, one-crime doctrine.

¶ 2    Following a bench trial in the circuit court of Cook County, the defendant-appellant, Gonzalo Guerrero, was convicted of armed robbery, aggravated battery, and mob action. The defendant was sentenced to 16 years' imprisonment. On appeal, the defendant contends that the State failed to prove him guilty of armed robbery, and that his multiple convictions violate the one-act, one-crime doctrine. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                              BACKGROUND

¶ 4     The State charged the defendant and his co-defendants, Ray Guereca, Luis Valdez, Elena Rios, and Jose Villalobos, with the aggravated kidnapping of Shaun Jurgens and Raymond Jerz; with first degree murder of Raymond Jerz; with armed robbery and aggravated battery of Shaun Jurgens; and with mob action. A simultaneous but severed bench trial of the defendant and co-defendants commenced, and the following evidence was presented.

¶ 5     On February 10, 2012, two friends, Raymond Jerz and Shaun Jurgens, attended a party in Chicago near 26th Street and Kedzie Avenue. Both Jerz and Jurgens lived in the suburbs, and a friend had driven them to the party in her car with some other friends. At the party, the driver's purse was stolen. Her car keys were in her purse and so the group had no way to get home. At approximately 3:00 a.m., Jerz and Jurgens walked to a nearby restaurant, Los Comales, while the rest of their friends waited at the party with the car. Inside the restaurant, Jerz and Jurgens ordered some food and sat down to eat. As they ate, they started making phone calls to try to find someone to give them a ride home.

¶ 6     Jurgens went into the restroom at Los Comales, where he encountered the defendant's co-defendants: Luis Valdez, Ray Guereca, and Jose Villalobos. Jurgens testified that the three men were being "loud and obnoxious" and that he could tell they were "gang bangers" but he was not scared of them. He believed they were members of the Satan Disciples street gang, or at least members of an affiliated and larger street gang, known as Folks. Jurgens had been a member of the Satan Disciples between the ages of 13 and 19. Although he was no longer a member of the Satan Disciples, he still had the six-point star and pitchfork tattoo on his right leg which signified

his prior membership.[1]

¶ 7     Jurgens approached Valdez, Guereca, and Villalobos and offered them $20 to drive him and his friends to the nearest train station so that they could get home. Jurgens, believing them to be members of the Satan Disciples or Folks street gang, displayed the tattoo on his leg. In response, the three men told Jurgens: "Hey, it's cool, Folks. We'll help you out."

¶ 8     However, the men were only pretending to be members of the Satan Disciples or Folks street gang. They were actually members of the Latin Kings street gang, who are rivals of the Satan Disciples. And the Latin Kings street gang is a part of the larger gang faction known as the People Nations, who are rivals of the Folks street gang. Had Jurgens suspected that the men were members of the Latin Kings or People Nations, he "wouldn't have been talking to them."

¶ 9     All of the men exited the restroom together. Jurgens told Jerz that the men he met in the restroom were going to pick up their other friends still at the party, and then give them all a ride to the train station. The group left Los Comales and entered a minivan behind the restaurant. Jerz and Jurgens shared the middle-row seat with Valdez and Villalobos. Guereca got in the driver's seat. Co-defendant Elena Rios was sitting in the passenger's seat. Two other women, Stephanie Del Rio and Tatiana Inovskis, were sitting in the backseat.

¶ 10     Del Rio testified that earlier in the night on February 10, 2012, Guereca picked her and Invoskis up in the van to take them to Rios' house. After drinking at Rios' house for a while, Del Rio, Invoskis, Rios, Valdez, and Guereca left and drove around in the van for three hours. Villalobos joined the group at some point. At around 3:00 a.m., the group stopped at Los Comales to use the restroom. Guereca parked the van in the back parking lot, and everyone except for

---

[1]The record reflects that Jerz had never been affiliated with any gangs.

Invoskis went inside to use the restroom.

¶ 11    When everyone returned to the van, Jerz and Jurgens came back with Valdez, Guereca, and Villalobos. Del Rio had never seen either Jerz or Jurgens before. She also noticed that Guereca's hat was now tilted to the right side, which was "unusual" because she knew he was a member of the Latin Kings, and Latin King members always tilt their hat to the left side. In fact, Guereca's hat had been tilted to the left when he entered Los Comales. Del Rio mentioned the direction of Guereca's hat to another man sitting next to her in the van, but the man pinched her, which she took to mean "calm down."

¶ 12    When Guereca pulled out of the Los Comales parking lot, Jurgens noticed that he began driving the van in the opposite direction from 26th Street and Kedzie Avenue, where his other friends were waiting at the party. This caused Jurgens to feel concerned, although he and Jerz remained silent. Guereca drove for five minutes into a neighborhood with which Jurgens was unfamiliar. The neighborhood turned out to be in "the heart of Latin Kings territory." During the five-minute drive, Guereca made a phone call to some of his friends and pretended to be a member of the Folks street gang, saying things such as "folks, we got this." He also pointed to some people at a gas station and called them "Flakes," a derogatory term for Latin King members.

¶ 13    Guereca stopped the van on a residential street in front of a garage door, at the mouth of an alleyway. Everyone exited the van, except for Jerz and Jurgens. An SUV then pulled up right next to the van. The defendant exited the SUV and spoke with his co-defendants. Suddenly, Jerz and Jurgens were dragged out of the van and into the street, in a space between the van and the SUV. The defendant and his co-defendants began beating Jerz and Jurgens. Jurgens felt himself being punched and kicked all over his body. He heard people yelling "Kill them, Folks," "Kill them

SDs," and "SDK," which stands for Satan Disciples Killer.

¶ 14    Jurgens managed to temporarily break away from the people beating him. He saw Jerz down the street being kicked and punched by at least five people. Jurgens ran toward Jerz, but Guereca hit him across the forehead with a metal pipe, which "totally dazed" him. He then ran across the street to try to escape. As he ran, he felt the defendant, Guereca, and Valdez grabbing at him. They pulled off his coat, watch, and bracelet. As Jurgens slipped out of his coat, he was able to break away from the men chasing him. The defendant and Guereca continued to chase and try to hit Jurgens, yelling "Let's get his ass." Jurgens was still running when he suddenly heard three gunshots, which caused him to freeze.

¶ 15    Meanwhile, Miguel Humberto Martinez was driving home from work. His house was located close to where the van and SUV had parked. Martinez testified that as he pulled up to the mouth of the alley, he saw the defendant, Guereca, and Valdez beating up Jurgens. Martinez honked his car horn, and then saw Jurgens briefly escape, followed by the defendant and Guereca chasing him. He looked across the street and saw Jerz trying to cover his face as Valdez, Rios, and others beat him. He saw Jerz try to get up, but Valdez held him down while the others continued to punch him.

¶ 16    The group then left Jerz lying in the street and entered the van. Valdez began driving the van, which accelerated toward Jerz. Martinez thought the van was going to run over Jerz, but it turned at the last minute and sped down a different street. Right then, Villalobos appeared with a gun and shot Jerz three times in the back.

¶ 17    Right after Jurgens heard the gun shots, he ran down the street to "try to find any kind of help." He ran down to a street corner, and realized that the defendant and Guereca were no longer

chasing him. His cell phone was dead so he could not call anyone for help. He then heard police sirens coming from the area he had last seen Jerz, so he headed back. When he returned to the area, he saw that the van, the SUV, and the people who had beat him were all now gone. Jurgens saw Jerz lying face down on the street. Jerz was nonresponsive and covered in blood and bullet holes; he was later pronounced dead at the scene.

¶ 18    Investigators arrived and found Jurgens' coat and broken bracelet at the scene. They also discovered Guereca's cell phone and recovered surveillance video from Los Comales, which showed the defendant's cohorts leaving with Jerz and Jurgens. Jurgens later identified the defendant in a lineup.

¶ 19    In closing its case, the State argued that, under a "common design" theory, each of the defendants was accountable for the others' actions. The defendant did not testify or offer any evidence in his defense.

¶ 20    At the conclusion of the trial, the trial court acquitted the defendant of first degree murder[2] and aggravated kidnapping, noting that he had arrived at the scene separately. The trial court found the defendant guilty of armed robbery, aggravated battery, and mob action. The trial court stated:

> "[Jurgens] made an [*sic*] horrendous mistake and he showed a tattoo
> of the Satan Disciples and saying that he's old school Satan
> Disciples. And that set off the chain of events. Now, I do not believe
> that up to that point that there was criminal intent that any of [the]
> defendants had formed against [Jerz and Jurgens,] but from that
> moment that's exactly what happened and [Valdez, Villalobos, and

---

[2]Only co-defendant Villalobos was found guilty of first degree murder.

Guereca] did form criminal intent and they acted quickly and immediately and it was like being put into a spider's web where somebody just falls into the web and cannot get out.

\*\*\*

[I]t is clear that a savage beating took place. This is gang activity in its truest nature. The only reason this happened is because they believed that [Jurgens] was a Satan Disciple. For that reason alone they thought it was incumbent upon them to take [Jerz and Jurgens] into their own territory and do as much damage as they could \*\*\*. And the taking of the property was done together as well. It was, I believe, part of a plan to rob and to beat."

¶ 21    In its sentencing decision, the trial court stressed the seriousness of the crimes, stating that it was "done for the sole purpose of asserting their superiority \*\*\* this is gang-banging in its purest extent." The court acknowledged that the defendant and his co-defendants were "all young people," but also that they all had criminal backgrounds. The court then sentenced the defendant and his co-defendants to individualized sentences. The defendant was sentenced to concurrent sentences of: 16 years for armed robbery; 5 years for aggravated battery; and 3 years for mob action. This appeal followed.

¶ 22                                                   ANALYSIS

¶ 23    We note that we have jurisdiction to review the trial court's judgment, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 24    The defendant presents the following two issues: (1) whether the State proved him guilty of armed robbery beyond a reasonable doubt; and (2) whether his conviction for mob action should be vacated under the one-act, one-crime doctrine.

¶ 25    The defendant first argues that the State failed to prove him guilty of armed robbery. He claims his intention was to only beat Jerz and Jurgens, and not to rob them. He argues that neither he nor his co-defendants *knowingly* took possession of Jurgens' coat and bracelet, as the items instead were merely pulled off during the physical struggle. He emphasizes that Jurgens' coat and bracelet were recovered at the scene.[3]

¶ 26    The State has the burden of proving each element of an offense, beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. When a defendant challenges the sufficiency of the evidence, the proper standard of review is; whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*. A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt as to the defendant's guilt. *Id*.

¶ 27    The operative offense at issue is armed robbery. "A person commits robbery when he or she knowingly takes property *** from the person or presence of another by use of force or by threatening the imminent use of force." 720 ILCS 5/18-1(a) (West 2012). And "a person commits armed robbery when he or she violates Section 18-1; and he or she carries on or about his or her person or is otherwise armed with a dangerous weapon other than a firearm." 720 ILCS 18-2(a)(1) (West 2012).

---

[3]The defendant does not contest that he and his group were "armed with a dangerous weapon, other than a firearm, to wit: a bludgeon."

¶ 28    The defendant concedes that a person need not take possession of the subject property in order to be convicted of robbery. *People v. Tiller*, 94 Ill. 2d 303, 316 (1982). Nonetheless, he contends that we should still reverse his conviction because Jurgens' coat and bracelet were simply "lost" during the "fight." This is an absurd argument under the facts of this case. There was never a "physical struggle" as the defendant portrays. Instead, it was a one-sided beating of the victims by the defendant and his group. And during the course of the beating, the defendant and his group robbed Jurgens of his property by forcefully ripping off his coat, bracelet, and watch.

¶ 29    The manner in which Jurgens' coat and bracelet were recovered is immaterial. The offense of robbery is complete when force or threat of force causes the victim to part with property against his will. *People v. Gaines*, 88 Ill. 2d 342, 367 (1981). There is no question that Jurgens did not part with his property voluntarily. Conviction for robbery was not contingent upon the defendant carrying away Jurgens' property after forcefully removing those items from Jurgens' person. *Id.* Reviewing the facts of the case, it is reasonable to infer that the defendant and his cohorts abandoned Jurgens' items when they were interrupted by Martinez honking his car horn and/or Villalobos shooting Jerz. Moreover, Jurgens testified that the defendant and his group also took his watch, and the record reflects that his watch was not recovered at the scene.

¶ 30    Still, the defendant argues that the State did not present any evidence at trial to prove that he had the requisite mental state to *knowingly* commit robbery. However, a defendant acts with knowledge when he is *consciously aware* that his conduct is *practically certain* to cause a particular result. *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 26; 720 ILCS 5/4-5 (West 2012). Further, a defendant's knowledge is generally established by circumstantial evidence rather than direct proof. *Castillo*, 2018 IL App (1st) 153147, ¶ 26. The circumstantial evidence in this case

clearly established that the defendant and his co-defendants were consciously aware that their actions would result in Jurgens losing his property against his will, *i.e.,* grabbing at Jurgens and his personal items as he ran away from them. The trial court even noted how the defendant and his group intended to rob Jerz and Jurgens *in addition to* beating them so that they could "do as much damage as they could." And it is irrelevant when that intent to rob was formed. See *People v. Kidd*, 175 Ill. 2d. 1, 43 (1996) ("If, as the result of a quarrel, a fight occurs in which one of the parties is overcome, and the other then, without having formed the intention before the fight began, takes the money of the vanquished one, the offense committed is robbery.") (quoting *People v. Jordan*, 303 Ill. 316, 319 (1922)). Thus, it does not matter if the defendant and his group originally planned to only beat Jerz and Jurgens, and then later decided to also rob them. It was nonetheless robbery. Accordingly, we affirm the defendant's conviction of armed robbery.

¶ 31     Next, the defendant argues that his conviction for mob action should be vacated pursuant to the one-act, one-crime doctrine. He claims that his conviction for mob action is a lesser-included offense because it "was predicated on the same underlying felony as the armed robbery and aggravated battery charges." The defendant avers that the State's "argument for mob action was coextensive with its argument as to why each defendant was accountable for each alleged offense, that '[t]hey were all working together' as part of a common design."[4]

---

[4]In his opening brief, the defendant argues that his conviction for aggravated battery should also be vacated pursuant to the one-act, one-crime doctrine because "the State did not distinguish between" the force used to effectuate the armed robbery and the aggravated battery. However, in his reply brief, the defendant concedes that these two convictions do not violate the one-act, one-crime doctrine in light of a recent decision from the Illinois Supreme Court, *People v. Smith*, 2019 IL 123901. In *Smith*, our supreme court held that a single punch, followed soon after by the taking of bags of currency from the victim, supported separate convictions for robbery and aggravated battery under the one-crime, one-act doctrine because there were "separate harms" through the physical harm and the taking of the property. *Id.*, ¶ 31. The defendant now concedes that "[w]here the battery at issue here encompassed strikes discrete from the grabbing of Jurgens' property ***, *Smith* governs."

¶ 32    Under the one-act, one-crime doctrine, "a defendant may not be convicted of multiple offenses that are based upon precisely the same single physical act." *People v. Johnson*, 237 Ill. 2d 81, 97 (2010). The reviewing court first determines whether the defendant's conduct consisted of a single physical act or separate acts. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). An "act" is defined as "any overt or outward manifestation which will support a different offense." *Id.* at 188. If one physical act was undertaken, then multiple convictions are improper. *Id.* at 186. If the defendant committed multiple acts, the court determines whether any of the convictions are for lesser-included offenses. *Id.* To determine whether a charged offense is a lesser-included offense of another charge, courts use the abstract elements approach, which compares the statutory elements of each offense. *People v. Willis*, 2014 IL App (4th) 130118, ¶¶ 20, 23. "If all the statutory elements of the lesser offense are included in the greater offense and if the lesser offense has no statutory element that the greater offense lacks, the lesser offense is included in the greater offense." *Id.*, ¶ 20. The application of the one-act, one-crime doctrine is a question of law, which we review *de novo. Johnson*, 237 Ill. 2d at 97.

¶ 33    Our analysis first requires us to determine whether the defendant's conduct consisted of a single act or of multiple acts. It is well established that multiple strikes are multiple acts. *People v. Dixon*, 91 Ill. 2d 346, 356 (1982). In the case at bar, the evidence showed that the defendant and his co-defendants: plotted together as a group to attack Jerz and Jurgens, struck both of them numerous times in a variety of ways, and robbed Jurgens. Undoubtedly, these were *separate physical acts* which support separate convictions. It is immaterial that they were *related* acts. "As long as there are multiple acts, their interrelationship does not preclude multiple convictions." *Dixon*, 91 Ill. 2d at 355–56.

¶ 34    The defendant makes much of the fact that the State charged him and his co-defendants with mob action *and* argued that, under a "common design" theory, each of the defendants was accountable for the others' actions for the armed robbery and aggravated battery charges. *People v. Jimerson*, 404 Ill. App. 3d 621 (2010), is instructive. In that case, this court held that the defendant's convictions for aggravated battery and mob action did not violate the one-act, one-crime doctrine when the incarcerated defendant led an attack against several correctional officers. *Id.* at 636–37. Even though the defendant argued that the convictions were based upon the same act, this court held that both convictions were proper based on the defendant's actions and under the theory of accountability presented at trial. *Id*. We stated: "The evidence at trial supported a finding that defendant was guilty of all charges as he and the other detainees worked in concert with force and violence to disturb the public peace and struck each of the officers as alleged, at least one time." *Id.*

¶ 35    Similarly here, the State sought the defendant's convictions based upon the defendant's own actions as well as his co-defendant's actions under an accountability theory. The evidence at trial supported a finding that the defendant and his co-defendants assembled together with the intent to attack Jerz and Jurgens (mob action) *and* that they worked together in concert to rob and beat them (armed robbery and aggravated battery). Thus, we reject the defendant's claim that the State's argument for mob action was "coextensive" with the charges for armed robbery and aggravated battery.

¶ 36    Having determined that multiple physical acts were undertaken by the defendant, we now compare the statutory elements of mob action with those of armed robbery and aggravated battery. A person commits the offense of mob action by: "the knowing assembly of two or more persons

with the intent to commit or facilitate the commission of a felony." 720 ILCS 5/25-1(a)(2) (West 2012). A person commits armed robbery when he knowingly takes property from the person or presence of another by use of force or by threatening the imminent use of force, and he carries on or about his person or is otherwise armed with a dangerous weapon other than a firearm. 720 ILCS 18-2(a)(1) (West 2012). And a person commits aggravated battery when he causes bodily harm to an individual or makes physical contact of an insulting or provoking nature with an individual, and in doing so he "uses a deadly weapon other than by discharge of a firearm." 720 ILCS 5/12-3.05(f)(1) (West 2012). Clearly, none of the statutory elements in mob action are included in armed robbery or aggravated battery. In other words, mob action is not a lesser-included offense of the other two offenses. Accordingly, we affirm the defendant's conviction of mob action.

¶ 37                                    CONCLUSION

¶ 38     For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 39     Affirmed.