# Illinois Official Reports

## Appellate Court

---

### *Levy v. Gold Medal Products Co.*, 2020 IL App (1st) 192264

---

| | |
|---|---|
| Appellate Court Caption | KAREN M. LEVY, Plaintiff, v. GOLD MEDAL PRODUCTS CO., Defendant (Gold Medal Products Co., Defendant and Third-Party Plaintiff-Appellee; Ventura Foods, LLC, Third-Party Defendant-Appellant). |
| District & No. | First District, Fifth Division<br>No. 1-19-2264 |
| Filed | April 24, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-5430; the Hon. Edward S. Harmening, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | Dennis J. Dobbels, Kathleen A. Hardee, and Jennifer J. Eng, of Polsinelli PC, of Kansas City, Missouri, for appellant.<br><br>Jamey B. Hiller, Katherine P. Decker, and Phillip T. Barrett, of Gordon Rees Scully Mansukhani, LLP, of Chicago, for appellee. |

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Presiding Justice Hoffman and Justice Delort concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff, Karen Levy, filed a fourth amended complaint in the circuit court of Cook County sounding in negligence and strict liability against defendant and third-party plaintiff, Gold Medal Products, Co. (Gold Medal). Gold Medal then filed an amended third-party complaint for contribution against various parties, including counts VII and VIII against third-party defendant Ventura Foods, LLC (Ventura). Count VII sought contribution under the Joint Tortfeasor Contribution Act (740 ILCS 100/0.01 *et seq.* (West 2016)), and count VIII sought contribution and/or indemnification under a contractual theory. Ventura filed a motion to dismiss counts VII and VIII for lack of personal jurisdiction, which the circuit court denied. Pursuant to Illinois Supreme Court Rule 306(a)(3) (eff. Oct. 1, 2019), Ventura appeals the circuit court's order denying its motion to dismiss counts VII and VIII of Gold Medal's amended third-party complaint for contribution for lack of personal jurisdiction. We affirm the denial of the motion to dismiss count VII, finding that the circuit court had specific personal jurisdiction over Ventura with respect to the claims against it under the Joint Tortfeasor Contribution Act. We reverse the denial of the motion to dismiss count VIII, finding that a forum selection clause mandates that the contractual allegations contained in count VIII be brought in Ohio.[1]

¶ 2        On October 3, 2017, Ms. Levy, a resident of Illinois, filed a third amended complaint in the circuit court against Gold Medal, Ventura, and a number of other defendants, seeking recovery for lung injuries allegedly caused by prolonged exposure to Gold Medal products containing butter flavoring chemicals such as diacetyl and acetyl propionyl. Gold Medal, an Ohio company with its principal place of business in Cincinnati, sold the products containing the butter flavoring chemicals to plaintiff's employer, Long Grove Popcorn Shoppe, Inc. (Long Grove), which has locations in Lake Zurich and in Elgin, Illinois. While working for Long Grove in the Lake Zurich and Elgin locations, plaintiff was exposed to the butter flavoring chemicals in the Gold Medal products and correspondingly developed respiratory system problems. Ventura was a limited liability company with a principal place of business in Brea, California, and was in the distribution chain of the diacetyl to which plaintiff was exposed.

¶ 3        Ventura filed a motion to dismiss plaintiff's third amended complaint, asserting that it was not subject to personal jurisdiction in Illinois. Before the circuit court ruled on Ventura's motion to dismiss, plaintiff dismissed Ventura from the action and filed a fourth amended complaint naming only Gold Medal as defendant.

¶ 4        On December 12, 2018, Gold Medal filed an amended third-party complaint in the circuit court for contribution against 14 third-party defendants, including Ventura. Ventura's

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

authorized agent accepted service of the third-party complaint in Springfield, Illinois. Counts VII and VIII were directed at Ventura. Count VII asserted that Ventura sold Gold Medal the products containing the butter flavoring chemicals diacetyl and acetyl propionyl, which Gold Medal then sold to Long Grove during plaintiff's employment there, causing her lung injuries. Gold Medal asserted a claim for contribution against Ventura based upon the Joint Tortfeasor Contribution Act. Count VIII asserted that Ventura had contractually agreed to defend, indemnify, and hold harmless Gold Medal from any loss, liability, damages, costs, and/or expenses arising out of the products that Gold Medal purchased from Ventura. Ventura breached the contract by failing to defend, indemnify, and hold harmless Gold Medal for any loss, liability, damages, costs, and expenses arising out of plaintiff's lawsuit based on her exposure to the diacetyl and acetyl propionyl contained in the products Ventura sold to Gold Medal. Gold Medal sought indemnification and/or contribution from Ventura based on their contract.

¶ 5       Ventura filed a motion to dismiss counts VII and VIII of the amended third-party complaint pursuant to section 2-301 of the Code of Civil Procedure (Code) (735 ILCS 5/2-301 (West 2016)), asserting that it was not subject to personal jurisdiction in Illinois. Ventura attached to its motion the affidavit of Jon Post.

¶ 6       In his affidavit, Mr. Post attested that he was a vice president at Ventura, a Delaware limited liability company with its principal place of business in Brea, California. Ventura manufactures products by the name of Pop A Lot and NAKS Pop Oil Bars (collectively referred to as the popcorn products) for Gold Medal. Ventura did not manufacture the popcorn products in Illinois, nor did Ventura sell or deliver them to Gold Medal in Illinois; rather, Ventura sold and/or delivered those products to Gold Medal "at locations outside the state of Illinois."

¶ 7       Mr. Post further attested that Ventura did not sell or deliver the popcorn products to Gold Medal "with any knowledge that the products would be delivered to the state of Illinois or with any intent that the products be delivered to the state of Illinois. Ventura *** did not control where or to whom Gold Medal might sell" the popcorn products.

¶ 8       Gold Medal filed a response to Ventura's motion to dismiss counts VII and VIII of its amended third-party complaint for contribution, arguing that Ventura's claim that it sold its popcorn products to Gold Medal without any knowledge or intent that those products would be delivered to Illinois is not credible. Gold Medal attached screenshots of Gold Medal's website listing 15 locations, including Chicago and central Illinois, and screenshots of Ventura's website, which shows that one of Ventura's manufacturing plants is located in Thornton, Illinois.

¶ 9       Gold Medal also attached the affidavit of Larry Christopher Burns, the food products division manager for Gold Medal. Mr. Burns attested that Gold Medal has its headquarters in Cincinnati, and that it has 15 additional "physical location branches in 11 states." Two Gold Medal branch locations are in Illinois. Long Grove purchased the Gold Medal products from one of the Illinois branch locations.

¶ 10      Mr. Burns further attested that suppliers to Gold Medal, such as Ventura, are familiar with Gold Medal's business, including its products, distribution channels, and end users. The fact that Gold Medal had two physical branch locations in Illinois "was information readily available to Gold Medal's suppliers in digital and written materials, as well as, freely available in the public domain."

¶ 11 Mr. Burns subsequently filed a supplemental declaration stating that, for at least the past decade, Gold Medal's website and product catalogs have listed its branch locations, which includes the two branches in Illinois.

¶ 12 On March 20, 2019, the circuit court granted Gold Medal leave to conduct discovery limited to the issue of the court's personal jurisdiction over Ventura. The parties completed the following discovery: (1) Ventura's responses to Gold Medal's request for admissions, (2) the deposition of Mr. Post, (3) the deposition of Arlene Ardoin, a Ventura employee, (4) the deposition of Christina Carlton, a Ventura employee, and (5) the deposition of Glenda Barrett, a former Ventura employee.

¶ 13 In its responses to Gold Medal's requests to admit, Ventura admitted that it has a manufacturing facility in Thornton, Illinois. Ventura also admitted that its website advertises that it is "best suited to meet customers' ever-evolving needs for custom food solutions at their many locations," that its "network of distribution centers ensures timely delivery of products to customer locations in North America and around the world," and that "[t]o serve [its] customers across the U.S. and Canada, and in more than 60 countries, Ventura Foods operates 15 manufacturing plants, three culinary centers and numerous distribution facilities." Ventura admitted that it was aware that between 2004 and 2016, some of its customers, including Gold Medal, resold or distributed some of its products. Ventura denied that Ms. Ardoin and/or Ms. Carlton knew that between 2004 and 2016 Gold Medal had branch locations in Bensenville, Illinois, and in Galesburg, Illinois. Ventura denied that it knew that Gold Medal sold products in Illinois between 2004 and 2016.

¶ 14 Mr. Post testified that he is the vice president of national distributors for Ventura, meaning that he helps provide Ventura products to the top 10 national distributors in the food service industry. Gold Medal was not one of those top 10 national distributors. Mr. Post was aware that Gold Medal provides concession-related products to the theater industry, and that it has several locations across the country, but he never had any communication with anyone at Gold Medal and never traveled to any Gold Medal locations. Mr. Post had no knowledge of how Gold Medal distributes and sells its products.

¶ 15 Mr. Post testified that Ventura manufactures its popcorn products in Louisiana, puts the Gold Medal labeling on those products, and sells them to Gold Medal "in areas outside of Illinois." Ventura's manufacturing plant in Thornton, Illinois, does not manufacture popcorn products, but instead makes "dressing products and also dips."

¶ 16 Ms. Barrett testified that she was the sales coordinator for Ventura for 29 years, meaning that she was the primary contact for customers in the concession industry who placed orders for the delivery of Ventura products. Ventura would only deliver to customers who ordered at least 6000 pounds of its products at a time. Ms. Barrett's job did not require her to know anything about her customers' organizational structure, nor did she need to know her customers' geographical reach or to whom they were selling their products.

¶ 17 Gold Medal had been a customer of Ventura since at least the mid-nineties; Ms. Barrett was "the contact person at Ventura for Gold Medal products." Ventura sold Gold Medal 40,000 pounds of popcorn products at a time.

¶ 18 The popcorn products were manufactured in Louisiana and Alabama and delivered to Gold Medal in Cincinnati. Ms. Barrett did not know anything about Gold Medal's customer base or distribution network, and she did not know what Gold Medal did with the popcorn products once they were delivered to it in Cincinnati. Other than Cincinnati, Ms. Barrett only knew of

four other Gold Medal branch retail locations—in Florida, Tennessee, Louisiana, and North Carolina—because she received orders from those branches. Ms. Barrett did not know whether Gold Medal sold any products in Illinois.

¶ 19　　Ms. Barrett testified that as sales coordinator, she had reviewed Gold Medal's website as well as its products catalog.

¶ 20　　Ms. Carlton testified that she has worked at Ventura since 2014, selling concession oils, and that Ventura has 99% of the market. Ms. Carlton has been Gold Medal's primary contact at Ventura since Ms. Barrett's retirement in February 2014. Ventura manufactures a concession oil called Pop-n-Lite (which Ventura relabels as Pop A Lot for sale by Gold Medal) and NAKS Pop Oil Bars in Louisiana. It sells them to Gold Medal somewhere between 5 to 10 times per year. The Pop-n-Lite is distributed to every contiguous state in the United States, including Illinois. Ms. Carlton knows that Gold Medal sells concessions to movie theaters and that Gold Medal distributes its products nationally, but she does not know whether Gold Medal specifically sells products in Illinois.

¶ 21　　Ms. Carlton was aware that Ventura has a customer in Illinois, other than Gold Medal, who purchases products from Ventura six times per year.

¶ 22　　Ms. Ardoin testified that she is the sales support coordinator in Ventura's concession department, meaning she enters the orders into the computer system detailing what the customer has ordered and where the order is being delivered. Gold Medal buys coconut oil products from Ventura, including Pop-n-Lite, which is manufactured in Louisiana and shipped to all 50 states. Gold Medal also buys NAKS Pop Oil Bars, which Ventura manufactures in Alabama. Ms. Ardoin knows that Gold Medal is involved in concession and popcorn sales and that it has a distribution network throughout the United States, but she does not know whether Gold Medal specifically sells products in Illinois. Ventura never limited the states to which Gold Medal could sell the products that it bought from Ventura.

¶ 23　　Ms. Ardoin testified that Ventura has a manufacturing facility in Illinois and that it sells "oil products" to customers in Illinois.

¶ 24　　On October 8, 2019, the circuit court denied Ventura's motion to dismiss counts VII and VIII of Gold Medal's amended third-party complaint for lack of jurisdiction. On November 6, 2019, Ventura filed a petition for leave to appeal the October 8 order denying its motion to dismiss pursuant to Rule 306(a)(3). On December 4, 2019, the appellate court granted Ventura's petition for leave to appeal.

¶ 25　　First, we address the circuit court's order denying Ventura's motion to dismiss count VII of Gold Medal's amended third-party complaint, which asserted a clam for contribution against Ventura under the Joint Tortfeasor Contribution Act, for lack of specific personal jurisdiction.

¶ 26　　Gold Medal bears the burden to establish a *prima facie* case to exercise personal jurisdiction over the nonresident, third-party defendant Ventura. *Russell v. SNFA*, 2013 IL 113909, ¶ 28. Where, as here, the circuit court determines the issue of personal jurisdiction on the pleadings and materials produced during discovery without conducting an evidentiary hearing, our review is *de novo*. *Id.* Any conflicts in the pleadings and affidavits must be resolved in Gold Medal's favor for purposes of determining whether jurisdiction has been established. *Id.*; *Campbell v. Acme Insulations, Inc.*, 2018 IL App (1st) 173051, ¶ 10. We may consider any affidavits and discovery depositions submitted by the parties; unrebutted allegations are taken as true. *Campbell*, 2018 IL App (1st) 173051, ¶ 10.

¶ 27    Section 2-209 of the Code (735 ILCS 5/2-209 (West 2016)), commonly known as the long-arm statute, governs the exercise of personal jurisdiction by an Illinois court over a nonresident. Gold Medal contends that subsection (c) of the long arm statute supports a finding of personal jurisdiction over Ventura here. Subsection (c) states that a court may exercise jurisdiction on any "basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." *Id.* § 2-209(c). To determine whether jurisdiction is appropriate under subsection (c), we consider the constitutional limits placed on a state's authority to exercise jurisdiction over the nonresident. *Aspen American Insurance Co. v. Interstate Warehousing, Inc.*, 2017 IL 121281, ¶ 13. Ventura does not argue that the Illinois Constitution imposes any greater restraints on the exercise of jurisdiction than the United States Constitution, and therefore we consider only federal constitutional principles. *Id.*

¶ 28    The United States Supreme Court has held that the federal due process clause permits a state court to exercise personal jurisdiction over a nonresident defendant only when he has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The action must also arise out of or be related to the nonresident defendant's contacts with the forum state, and it must be reasonable to require defendant to litigate there. *Kowal v. Westchester Wheels, Inc.*, 2017 IL App (1st) 152293, ¶ 17.

¶ 29    In determining whether the minimum contacts test has been satisfied, we consider the category of personal jurisdiction being sought—either general or specific. General jurisdiction for a corporate defendant exists when the minimum contacts requirement has been satisfied by the nonresident defendant's continuous and substantial business activity within the forum. *Russell*, 2013 IL 113909, ¶ 36 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923-24 (2011)). Specific jurisdiction requires a showing that the nonresident defendant has "purposefully directed its activities at the forum state and the cause of action arose out of or relates to the defendant's contacts with the forum state." *Id.* ¶ 40 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Gold Medal here argues only that the circuit court has specific jurisdiction over Ventura; no argument is made regarding general jurisdiction. Therefore, we need not address that issue. We proceed to consider whether the circuit court has specific jurisdiction over Ventura with respect to count VII of Gold Medal's amended third-party complaint for contribution.

¶ 30    One way to satisfy the minimum contacts requirement for specific jurisdiction is under the stream of commerce theory, which the United States Supreme Court first articulated in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). In *World-Wide Volkswagen*, the Supreme Court held that a forum state may exercise personal jurisdiction over a nonresident defendant that "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 297-98. The Supreme Court explained that it is not unreasonable to subject a nonresident defendant to suit in the forum state, if the sale of the nonresident defendant's product is not simply an isolated transaction but arises from the efforts of the nonresident defendant to serve that state. *Id.* at 297.

¶ 31    Applying those principles to the facts in *World-Wide Volkswagen*, the Supreme Court held that an Oklahoma state court could not exercise personal jurisdiction over defendants, a nonresident automobile retailer and its wholesale distributor in a products liability action, where defendants' only connection with Oklahoma was that a buyer in New York had

purchased one of their automobiles and drove it to Oklahoma, where the accident occurred. *Id.* at 297-98. The nonresident defendants' market was limited to New York, New Jersey, and Connecticut, and the record contained no evidence that any automobiles were sold to retail customers outside that tristate area, let alone Oklahoma. *Id.* at 298. The Supreme Court noted that even if it was foreseeable that an automobile sold by defendants would be driven to Oklahoma, "the mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.' " *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

¶ 32    Seven years after deciding *World-Wide Volkswagen*, the Supreme Court addressed the stream of commerce theory again in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987) (plurality opinion). In *Asahi*, Gary Zurcher was severely injured, and his wife was killed, when he lost control of his motorcycle and collided with a tractor on a highway in California. *Id.* at 105. Mr. Zurcher filed a product liability action in California against Cheng Shin Rubber Industrial Co., Ltd. (Cheng Shin), the Taiwanese manufacturer of the motorcycle's tire tubes, alleging that the tube was defective and caused his accident. *Id.* at 106. Cheng Shin filed a cross-complaint seeking indemnification from Asahi Metal Industry Co., Ltd. (Asahi), the Japanese manufacturer of the tube's valve assembly. *Id.* Mr. Zurcher's claims were eventually settled and dismissed, leaving only the indemnity action between Chen Shin and Asahi before the California court. *Id.*

¶ 33    Asahi moved to quash Cheng Shin's service of summons, arguing that California could not exercise jurisdiction over it consistent with the due process clause of the fourteenth amendment. *Id.* The California state court denied Asahi's motion to quash. *Id.* at 107. The cause was eventually appealed to the United States Supreme Court, which unanimously held that California could not exercise personal jurisdiction over Asahi because to do so would be unfair. *Id.* at 113. However, the Supreme Court was split on the separate issue of whether sufficient minimum contacts had been established and issued three separate opinions.

¶ 34    Justice O'Connor, joined by Chief Justice Rehnquist and Justices Powell and Scalia, advanced the narrow stream of commerce theory, concluding that the placement of a product into the stream of commerce, without more, is not an act by defendant purposefully directed toward the forum state sufficient to satisfy the minimum contacts test. *Id.* at 112 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.). Minimum contacts with the forum state requires additional conduct by the nonresident defendant, such as "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* Justice O'Connor found that minimum contacts were lacking where Asahi did not do business in California; did not have any office, agents, employees, or property in California; did not advertise in California, did not design its product in anticipation of sales in California; and did not create, control, or employ the distribution system that brought its valves to California. *Id.*

¶ 35    Justice Brennan, joined by Justices White, Marshall, and Blackmun, adopted the broad stream of commerce theory. Under this theory, the forum state can assert personal jurisdiction over the nonresident defendant if he is involved in "the regular and anticipated flow of products from manufacture to distribution to retail sale" and is "aware that the final product is being marketed in the forum State." *Id.* at 117 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall, and Blackmun, JJ.). Justice Brennan argued that the

stream of commerce theory did not require the "additional conduct" proposed by Justice O'Connor. *Id.* Justice Brennan found that minimum contacts with California existed because Asahi was aware of the distribution system's operation that carried its valve assemblies into California and knew that it would benefit economically from the sale in California of products incorporating its components. *Id.* at 121. Justice Brennan concluded, though, that this was the rare case in which even though Asahi had minimum contacts with California, personal jurisdiction would not comport with fair play and substantial justice. *Id.* at 116.

¶ 36    Justice Stevens, joined by Justices White and Blackmun, argued that the Supreme Court should not even address the minimum contacts issue because the Court had unanimously agreed that it would be unreasonable and unfair for the California court to exercise jurisdiction over Asahi. *Id.* at 121 (Stevens, J., concurring in part and concurring in the judgment, joined by White and Blackmun, JJ.).

¶ 37    Following *Asahi*, the Illinois Supreme Court addressed the stream of commerce theory in *Wiles v. Morita Iron Works Co.*, 125 Ill. 2d 144 (1988). Floyd Wiles was injured while cleaning a machine at his employer's plant in Illinois. *Id.* at 147. His employer, Astro Packaging Company (Astro), had bought the machine in Japan from Morita Iron Works (Morita) and shipped it to the Illinois plant. *Id.* Mr. Wiles brought a suit grounded in strict liability and negligence against Morita in the circuit court. *Id.* at 146. Morita filed a motion to dismiss, challenging the *in personam* jurisdiction of the circuit court. *Id.* The circuit court quashed the service of process on Morita and dismissed it from this action. *Id.* The appellate court reversed the circuit court's order, and the supreme court granted Morita's petition for leave to appeal. *Id.*

¶ 38    The Illinois Supreme Court recognized the two competing versions of the stream of commerce theory presented in *Asahi*—the narrow theory advanced by Justice O'Connor and the broad theory advanced by Justice Brennan (*id.* at 156-57)—but declined to decide which theory was correct. *Id.* at 159-60. The Illinois Supreme Court did hold that, under either theory, "it is clear that purposeful availment of the forum's market requires, at a *minimum*, that the alien defendant is '*aware* that the final product is being marketed in the forum State.' " (Emphases in original.) *Id.* at 160. In applying this standard, the Illinois Supreme Court found that Morita did not have the requisite minimum contacts with Illinois, as there was no evidence that Morita was aware during contract negotiations, or at the time of delivery of the machine to Astro in Japan, that Astro intended to transport the machine to Illinois or that Astro even had a plant in Illinois. *Id.* Because Astro's unilateral act of transporting the machine from Japan to Illinois did not satisfy the minimum contacts standard, the Illinois Supreme Court found that Mr. Wiles's action against Morita should be dismissed for lack of personal jurisdiction. *Id.*

¶ 39    Subsequent to *Wiles*, the United States Supreme Court revisited the stream of commerce theory in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011) (plurality opinion). In *J. McIntyre*, Robert Nicastro seriously injured his hand while using a metal-shearing machine manufactured by J. McIntyre Machinery, Ltd. (J. McIntyre). *Id.* at 878. The accident occurred in New Jersey, but the machine was manufactured in England, where J. McIntyre is incorporated and operates. *Id.* Mr. Nicastro brought suit against J. McIntyre in New Jersey, and the Supreme Court of New Jersey ultimately held that J. McIntyre was subject to the jurisdiction of the New Jersey trial court. *Id.* at 877.

¶ 40    On appeal to the United States Supreme Court, six justices found that the New Jersey trial court could not exercise specific personal jurisdiction over the British defendant, J. McIntyre,

and reversed the Supreme Court of New Jersey. *Id.* at 887 (Breyer, J., concurring in the judgment, joined by Alito, J.). However, the six justices did not agree on the application of the stream of commerce theory.

¶ 41    In a plurality opinion joined by Chief Justice Roberts, Justice Scalia, and Justice Thomas, Justice Kennedy endorsed the narrow stream of commerce theory articulated by Justice O'Connor in *Asahi*. *Id.* at 885 (plurality opinion). Justice Kennedy stated that the principal inquiry in all specific jurisdiction cases is whether the nonresident defendant's "activities manifest an intention to submit to the power of a sovereign. In other words, the defendant must 'purposefully avai[l] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Id.* at 882 (quoting *Hanson*, 357 Ill. at 253). "The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." *Id.* Justice Kennedy found that J. McIntyre did not engage in conduct purposefully directed at New Jersey, based on the following facts: J. McIntyre did not market its products in New Jersey but instead used an independent Ohio-based distributor to sell its products in the United States, J. McIntyre had no office or employees in New Jersey and did not pay taxes or own property there, and J. McIntyre did not have a single contact with New Jersey except for the single machine ending up in the state. *Id.* at 886.

¶ 42    In a concurring opinion, Justice Breyer, joined by Justice Alito, agreed with the Kennedy plurality's decision that the New Jersey court did not have jurisdiction over J. McIntyre, but for different reasons. *Id.* at 893 (Breyer, J., concurring in the judgment, joined by Alito, J.). Justices Breyer and Alito agreed with the judgment because in *World-Wide Volkswagen*, the Supreme Court had held that "a single sale to a customer who takes an accident-causing product to a different State (where the accident takes place) is not a sufficient basis for asserting jurisdiction." *Id.* at 888. Justices Breyer and Alito also noted that the Court's separate opinions in *Asahi* "strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." *Id.* at 888-89. According to Justices Breyer and Alito, the outcome of the case should have been decided on these precedents, meaning that there was no need for the Kennedy plurality opinion to make "broad pronouncements that refashion basic jurisdictional rules." *Id.* at 890.

¶ 43    In dissent, Justice Ginsburg, joined by Justices Sotomayor and Kagan, argued that the New Jersey court had jurisdiction over J. McIntyre because it had targeted the entire United States market. *Id.* at 898 (Ginsburg, J., dissenting, joined by Sotomayor and Kagan, JJ.). J. McIntyre had arranged with an American-based distributor to market its products throughout the United States and regularly attended trade shows to reach customers nationwide. *Id.* at 896.

¶ 44    Following the decision in *J. McIntyre*, the Illinois Supreme Court revisited the stream of commerce theory in *Russell*, 2013 IL 113909. Michael Russell flew helicopters for an Illinois air ambulance service. *Id.* ¶ 4. He died after his helicopter crashed in Illinois. *Id.* Mr. Russell's estate brought suit in the circuit court against SNFA, a French company that manufactured a custom tail rotor bearing for the helicopter involved in the crash. *Id.* ¶ 1. The circuit court granted SNFA's motion to dismiss for lack of jurisdiction, and the appellate court reversed. *Id.*

¶¶ 21-22. The Illinois Supreme Court (the *Russell* court) granted SNFA's petition for leave to appeal. *Id.* ¶ 24.

¶ 45 The *Russell* court examined the relevant United States Supreme Court cases addressing the minimum contacts test and deciphered three points from the most recent such case, *J. McIntyre*. First, the *Russell* court noted that the Supreme Court had "unanimously endorsed the continued validity of the stream of commerce theory from *World-Wide Volkswagen* to establish specific personal jurisdiction, although the proper application of that theory is not settled." *Id.* ¶ 67.

¶ 46 Second, the *Russell* court noted that, according to a clear majority of the Supreme Court, "specific jurisdiction should *not* be exercised based on a single sale in a forum, even when a manufacturer or producer 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.' " (Emphases in original.) *Id.* ¶ 68 (quoting *J. McIntyre*, 564 U.S. at 891 (Breyer, J., concurring in the judgment, joined by Alito, J.)). The *Russell* court noted that this outcome is consistent with the conclusion in *Wiles* that the competing opinions in *Asahi* required, at a minimum, that the nonresident defendant be " ' "*aware* that the final product is being marketed in the forum State." ' " (Emphasis in original.) *Id.* (quoting *Wiles*, 125 Ill. 2d at 160, quoting *Asahi*, 480 U.S. at 117 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall, and Blackmun, JJ.)).

¶ 47 Third, the *Russell* court noted that a minority of the Supreme Court believes that a broader stream of commerce theory "should be applied to adapt to modern globalized commerce and is warranted under *International Shoe*'s focus on 'notions of fair play and substantial justice.' " *Id.* ¶ 69 (quoting *J. McIntyre*, 564 U.S. at 910 (Ginsburg, J., dissenting, joined by Sotomayor and Kagan, JJ.)). The *Russell* court stated that as in *Wiles*, it would not adopt either the broad or narrow version of the stream of commerce theory without more definitive guidance from a majority of the Supreme Court. *Id.* ¶ 71.

¶ 48 Applying these standards to the facts of the case before it, the *Russell* court found that under either version of the stream of commerce theory, SNFA, the French manufacturer of the tail rotor bearings that allegedly caused Mr. Russell's helicopter crash, had the requisite minimum contacts with Illinois sufficient for the circuit court to exercise specific personal jurisdiction over it. SNFA manufactured tail rotor bearings for Agusta S.p.A. (Agusta), an Italian manufacturer of helicopters. *Id.* ¶ 73. Agusta incorporated SNFA's tail rotor bearings into its helicopters and used an American subsidiary, AAC, to sell its helicopters internationally, including in the United States. *Id.* One of those helicopters was being flown by Mr. Russell in Illinois at the time of his crash. *Id.* ¶ 6. The *Russell* court found that SNFA had sufficient minimum contacts with Illinois under the broad stream of commerce theory because it knowingly allowed Agusta and AAC to repeatedly act as distributors of its tail rotor bearings throughout the United States (*id.* ¶ 76), and the tail rotor bearings reached Illinois (and allegedly caused Mr. Russell's helicopter crash) through this distribution network. *Id.* ¶ 74.

¶ 49 The *Russell* court found that SNFA had sufficient minimum contacts with Illinois under the narrow stream of commerce theory because, in addition to knowingly using an American distributor to repeatedly distribute and market its tail rotor bearings throughout the United States, SNFA also engaged in specific activity in Illinois by engaging in a business relationship with Hamilton Sundstrand, a manufacturer of aerospace machinery located in Rockford, Illinois. *Id.* ¶¶ 15, 79. SNFA made about $1 million in sales to the Rockford branch of Hamilton Sundstrand. *Id.* ¶ 79. SNFA's business relationship with the Rockford, Illinois, division of

Hamilton Sundstrand constituted the additional "purposefully directed conduct" or the "something more" required under Justice O'Connor's narrow stream of commerce theory. *Id.* ¶ 80.

¶ 50    The instant case is similar to *Russell*, in that under either version of the stream of commerce theory, Ventura has the requisite minimum contacts with Illinois sufficient for the circuit court to exercise specific personal jurisdiction over it with respect to count VII of Gold Medal's amended third-party complaint for contribution. As discussed earlier in this opinion, under the broad stream of commerce theory, the circuit court can assert personal jurisdiction over Ventura as long as it is involved in "the regular and anticipated flow of products from manufacture to distribution to retail sale" and is "aware that the final product is being marketed in" Illinois. *Asahi*, 480 U.S. at 117 (Brennan, J., concurring in part and concurring in the judgment, joined by White, Marshall, and Blackmun, JJ.). In finding that Ventura regularly manufactured products for Gold Medal that were subsequently distributed and sold in Illinois, and that Ventura was aware that those products were being marketed in Illinois, we rely on the following evidence: (1) Ms. Barrett's testimony that Gold Medal has been a customer of Ventura since at least the mid-nineties and that Ventura sells Gold Medal 40,000 pounds of popcorn products at a time, which Ventura manufactures in Alabama and Louisiana and delivers to Gold Medal in Cincinnati; (2) Ms. Carlton's testimony that Ventura, which has 99% of the market in concession oils, manufactures popcorn products in Louisiana and sells them all to Gold Medal 5 to 10 times per year, and that one of those products, Pop-n-Lite, is distributed to all contiguous states including Illinois; (3) Ventura's admissions that it was aware that Gold Medal resold and/or redistributed the products that it bought from Ventura; (4) Ms. Carlton's and Ms. Ardoin's testimony that they knew Gold Medal sells concessions to movie theaters and has a nationwide distribution network; (5) Ms. Barrett's testimony that, as sales coordinator, she has reviewed Gold Medal's website and products catalog; (6) Mr. Burns's affidavits in which he asserted that suppliers to Gold Medal, like Ventura, are familiar with Gold Medal's distribution channels and end users, and that Gold Medal's website and products catalogs list its two branch locations in Illinois; and (7) the screenshots of Gold Medal's website showing its Chicago and central Illinois branch locations.

¶ 51    This is not the case of a single sale of a product to a customer who unilaterally takes the injury-causing product to a different state unbeknownst to the manufacturer; rather, all the evidence shows that Ventura has manufactured and delivered 40,000 pounds of popcorn products to Gold Medal 5-10 times a year for at least 25 years, which amounts to a yearly total of between 200,000 and 400,000 pounds, knowing that Gold Medal redistributes the popcorn products nationwide. Plaintiff's employer, Long Grove, was one of the Illinois businesses to which Gold Medal sold the popcorn products, and the butter flavoring chemicals in those products allegedly caused plaintiff's lung injuries. On all these facts, Ventura has sufficient minimum contacts with Illinois under the broad stream of commerce theory such that the circuit court may assert specific personal jurisdiction over Ventura here with respect to count VII of Gold Medal's amended third-party complaint for contribution.

¶ 52    We recognize that certain Ventura employees—specifically, Mr. Post, Ms. Barrett, Ms. Carlton, and Ms. Ardoin—all stated that they were unaware whether Gold Medal specifically sells its popcorn products in Illinois and that Ms. Barrett also testified to her unawareness of Gold Medal's branch location in Illinois. However, to the extent that the statements of these Ventura employees conflict with Mr. Burns's affidavits regarding

Ventura's knowledge of Gold Medal's distribution channels and end users, we must construe all conflicts in the evidence in favor of Gold Medal. *Russell*, 2013 IL 113909, ¶ 84.

¶ 53    We further note that the statements by the Ventura employees are insufficient to defeat the circuit court's specific personal jurisdiction over Ventura here under the broad stream of commerce theory according to *Russell*. In *Russell*, the Illinois Supreme Court found that a statement by one of SNFA's employees that he was unaware of whether Agusta's helicopters (containing SNFA's tail rotor bearings) were sold in Illinois (*id.* ¶ 19) did not bar the circuit court from asserting jurisdiction over SNFA under the broad stream of commerce theory; the *Russell* court held that, regardless of the employee's self-serving statement, the circuit court had jurisdiction because SNFA knowingly used a distribution network to repeatedly sell its tail rotor bearings nationwide and the tail rotor bearings involved in Mr. Russell's accident reached Illinois via the nationwide distribution network. *Id.* ¶¶ 74-76, 85. For purposes of establishing minimum contacts under the broad stream of commerce theory, SNFA's knowing and repeated use of the nationwide distribution network was sufficient to make it aware that its tail rotor bearings were likely to end up in Illinois such that the circuit court could assert specific personal jurisdiction over SNFA with regard to the suit brought against it arising out of Mr. Russell's helicopter crash. *Id.*

¶ 54    Similarly, in the present case, Ventura had sufficient minimum contacts with Illinois under the broad stream of commerce theory (1) where, for at least 25 years, it annually sold 200,000 to 400,000 pounds of its popcorn products to Gold Medal, knowing that Gold Medal redistributed those products nationwide, and (2) where the popcorn products allegedly causing plaintiff's lung injuries reached Illinois as a result of the nationwide distribution network. Ventura's repeated and knowing use of Gold Medal to redistribute its popcorn products nationwide was sufficient to make Ventura aware that those products were likely to end up in Illinois, such that the circuit court could assert specific personal jurisdiction over Ventura under the broad stream of commerce theory with respect to count VII of Gold Medal's amended third-party complaint for contribution.

¶ 55    Furthermore, even under the narrow stream of commerce theory, we find that Ventura had sufficient minimum contacts with Illinois because, in addition to selling Gold Medal 200,000 to 400,000 pounds of popcorn products per year for 25 years, knowing that Gold Medal resold those products nationwide, Ventura engaged in the requisite additional conduct by also labeling those products with the Gold Medal brand names for sale in Illinois. Ventura also sells 6000 pounds of its products to customers in Illinois other than Gold Medal multiple times per year. Ventura has thus done more than simply place its popcorn products into the nationwide stream of commerce; it has also engaged in conduct purposefully directed at Illinois regarding those products, which is all that is required under the narrow stream of commerce theory to allow the circuit court to assert specific personal jurisdiction over Ventura with respect to count VII of Gold Medal's amended third-party action for contribution.

¶ 56    We next consider whether Gold Medal has demonstrated that count VII of its amended third-party action against Ventura arose out of or was related to Ventura's contacts with Illinois. The "arising out of" or "related to" standard is a lenient and flexible one. *Id.* ¶ 83. We find that the requirement has been met in this case. As discussed earlier in this opinion, Ventura had sufficient minimum contacts with Illinois for purposes of specific personal jurisdiction with respect to count VII where (1) it annually manufactured, labeled, and distributed 200,000 to 400,000 pounds of popcorn products to Gold Medal as part of a 25-year business relationship

in which Ventura knew that Gold Medal would redistribute those products nationwide, and (2) Ventura had additional business contacts in the state. Plaintiff was allegedly injured after Gold Medal resold some of those popcorn products to her employer in Illinois, and while working there, she breathed in certain butter flavoring chemicals contained in the popcorn products. Plaintiff brought suit in the circuit court, sounding in negligence and strict liability against Gold Medal. In count VII of its amended third-party complaint, Gold Medal then sought contribution against Ventura under the Joint Tortfeasor Contribution Act, alleging that Ventura's negligent acts and omissions in the manufacturing, processing, and distribution of the popcorn products contributed to plaintiff's injuries in Illinois. On all these facts, count VII of Gold Medal's amended third-party complaint for contribution arose out of or was related to Ventura's contacts with Illinois.

¶ 57 Next, we consider whether it would be reasonable to require Ventura to litigate count VII of Gold Medal's amended third-party complaint for contribution in Illinois. *Id.* ¶ 87. The factors to consider when deciding reasonableness include (1) the burden imposed on Ventura by requiring it to litigate in Illinois, (2) Illinois's interest in resolving the dispute, (3) Gold Medal's interest in obtaining relief, and (4) the interests of the other affected forums in the efficient judicial resolution of the dispute and advancement of substantive social policies. *Id.*

¶ 58 The burden imposed on Ventura by requiring it to litigate in Illinois is low, as it has ties to Illinois as evidenced by its manufacturing plant in Thornton, Illinois, its regular conduct of business in Illinois, and its registered agent in Springfield. We may also take judicial notice of the public records showing that Ventura has been a party to litigation in the circuit court and retained local counsel on multiple occasions, further indicating that the burden by requiring it to litigate in Illinois is low. See *People v. Jimerson*, 404 Ill. App. 3d 621, 634 (2010) ("[A] reviewing court may take judicial notice of public records and other judicial proceedings.").

¶ 59 Illinois has an interest in resolving the dispute, as it stems from Ventura's selling of popcorn products to Gold Medal that were resold to plaintiff's employer in Illinois. Plaintiff allegedly suffered lung injuries when she breathed in certain chemicals contained in those products. Illinois's interest implicates the societal concerns of products liability and occupational safety.

¶ 60 Gold Medal clearly has an interest in obtaining contribution from Ventura for any damages it is required to pay plaintiff arising out of her lawsuit in Cook County related to her breathing in of the chemicals in the popcorn products.

¶ 61 Ventura points to no forum having a greater interest in the resolution of this dispute.

¶ 62 On all these facts, we find that it would be reasonable to require Ventura to litigate count VII of Gold Medal's amended third-party complaint for contribution in Illinois.

¶ 63 Accordingly, we affirm the circuit court's order denying Ventura's motion to dismiss count VII of Gold Medal's amended third-party complaint for contribution.

¶ 64 Next, we address the denial of the motion to dismiss count VIII of Gold Medal's amended third-party complaint for contribution. Count VIII alleged that Gold Medal's written purchase orders with Ventura contained language contractually requiring Ventura to defend, indemnify, and hold harmless Gold Medal from any loss, liability, damages, costs, and/or expenses arising out of products that Gold Medal purchased from Ventura. Gold Medal claimed that Ventura breached the contract by failing to defend, indemnify, and hold it harmless for any loss, liability, damages, costs, and expenses arising out of plaintiff's lawsuit based on her exposure

- 13 -

to the diacetyl and acetyl propionyl contained in the popcorn products that Ventura sold to Gold Medal.

¶ 65    Gold Medal submitted an affidavit from Brandon James, its general counsel, asserting that Gold Medal's purchase orders incorporated its "Standard Gold Medal Terms and Conditions." Those standard Gold Medal Terms and Conditions include a provision stating:

> "APPLICABLE LAW
>
> This agreement, including all contract documents, attachments and these terms and conditions, shall be governed by the laws of the State of Ohio and all legal actions shall be brought in a court of competent jurisdiction in the State of Ohio."

¶ 66    Ventura argues that this forum selection clause requires that count VIII of Gold Medal's amended third-party complaint for contribution be brought in Ohio. We agree. In Illinois, "a forum-selection clause in a contract is *prima facie* valid and should be enforced unless the opposing party shows that enforcement would be unreasonable under the circumstances." *Dancor Construction, Inc. v. FXR Construction, Inc.*, 2016 IL App (2d) 150839, ¶ 75. Gold Medal has not shown that enforcement of the forum selection clause would be unreasonable under the circumstances; accordingly, we reverse the denial of Ventura's motion to dismiss count VIII of Gold Medal's amended third-party complaint for contribution.

¶ 67    Gold Medal argues that Ventura forfeited review of its forum selection argument by failing to timely raise it in the circuit court. Gold Medal's forfeiture argument is unavailing, as the record shows that Ventura raised this argument in the circuit court in its supplemental brief in support of its motion to dismiss count VIII.

¶ 68    For all the foregoing reasons, we affirm the denial of Ventura's motion to dismiss count VII of Gold Medal's amended third-party complaint for contribution. We reverse the denial of Ventura's motion to dismiss count VIII of Gold Medal's amended third-party complaint.

¶ 69    Affirmed in part and reversed in part.