NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230126-U

NO. 4-23-0126

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 5, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| CHRISTOPHER JENSEN, | ) | No. 11CF1467 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Brendan A. Maher, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held:* The appellate court affirmed defendant's conviction, concluding that (1) defendant was not denied a fair trial and (2) trial counsel did not provide ineffective assistance.

¶ 2    In October 2013, a jury found defendant, Christopher Jensen, guilty of attempted first degree murder (720 ILCS 5/8-4(a) (West 2008)), 9-1(a)(1)), home invasion (*id.* § 11(a)(4)) and aggravated battery with a firearm (*id.* § 12-4.2(a)(1)). The trial court later sentenced him to an aggregate sentence of 70 years in prison.

¶ 3    Defendant appealed, and in March 2016, the Second District Appellate Court remanded for a preliminary hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). *People v. Jensen*, 2016 IL App (2d) 131348-U, ¶ 24. On remand, the trial court appointed new counsel, who filed a supplemental motion for a new trial. After conducting a hearing on whether defendant's trial counsel was ineffective, the court denied defendant's

motion for a new trial.

¶ 4    Defendant appeals, arguing that (1) he was denied a fair trial because the jury did not receive the correct written jury instructions and (2) trial counsel provided ineffective assistance by failing to (a) object to a "highly prejudicial" 911 call made by the victim, (b) present evidence that defendant was aware of the victim's history of violence, and (c) object to the admission of defendant's prior unlawful use of a weapon conviction for impeachment purposes. We disagree and affirm.

¶ 5                                    I. BACKGROUND

¶ 6                                    A. The Charges

¶ 7    In February 2013, defendant was charged with four counts of attempted first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)), three counts of home invasion (*id.* § 12-11(a)(3), (a)(4), (a)(5)), six counts of aggravated battery with a firearm (*id.* § 12-4.2(a)(1)), and one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The State alleged these offenses occurred in June 2009. The State generally alleged that defendant entered, without authority, Tim Alfredson's home and shot him in the head, left tricep, left forearm, lower left abdomen, lower left abdomen area, and left chest.

¶ 8                                    B. Pretrial Motions

¶ 9    In February 2013, the State filed motions *in limine* (1) to allow the State to present evidence of the 911 phone call Alfredson placed after being shot; (2) to exclude evidence of a September 2007 domestic violence incident involving Alfredson and his wife, Felicia Alfredson; and (3) to allow the State, pursuant to *People v. Montgomery*, 47 Ill. 2d 510, 268 N.E.2d 695 (1971), to admit defendant's three prior felony convictions for impeachment purposes if he testified at trial—namely, convictions for burglary in 2007, unlawful use of a

weapon in 2008, and forgery in 2010.

¶ 10 In July 2013, the trial court conducted a hearing on the motions *in limine*. Regarding the 911 call, the court asked defense counsel if he had had an opportunity to listen to the recording. Counsel replied that he had not listened to it but had no objection to its being admitted because he also wanted it to be played.

¶ 11 Regarding the *Montgomery* motion, the trial court stated that it was applying the balancing test as set forth in *Montgomery* and concluded that the probative value of the convictions outweighed any possible prejudicial effect.

¶ 12 Regarding the domestic violence evidence, the State argued that because defendant had not made a self-defense claim, the evidence was irrelevant. The trial court agreed but told defense counsel that the parties could revisit the issue if "something happens that they think *** opens the door to its relevancy."

¶ 13 Ultimately, the trial court granted all three motions *in limine*.

¶ 14 In October 2013, defendant filed written notice that he would be asserting self-defense at trial.

¶ 15 C. The Trial Evidence

¶ 16 Later, in October 2013, the trial court conducted defendant's jury trial.

¶ 17 1. *Tim Alfredson*

¶ 18 Tim Alfredson testified that on June 29, 2009, he lived at 634 15th Avenue in Rockford, Illinois. He owned about 20 firearms at that time, most of which he kept locked in a gun case. However, he kept one pistol holstered in his coffee table drawer in the "breezeway" of his home.

¶ 19 That evening, Alfredson's friend, Edward Kettner, stopped by Alfredson's home

to show him Kettner's Rottweiler puppy. Kettner also helped Alfredson put a cover on his pool before Kettner left.

¶ 20　　　　　While Kettner was at Alfredson's house, Alfredson drank some beer. He had consumed "[p]robably about six beers that day." He also had taken a "[c]ouple hits here and there" of cannabis. Alfredson testified that he did not sell cannabis but would buy some for his friends, who would then repay him. On June 29, 2009, he had only a personal amount of cannabis in his home.

¶ 21　　　　　After Kettner left, Alfredson returned to his house through the sliding glass door of his patio deck. That door led to his "breezeway." Alfredson shut the sliding screen door and then heard a "click" behind him. As he turned around, he was shot in his left side and fell to the floor. Alfredson testified, "[A]s I was falling down, to stop myself from hitting the tile floor, I just seen two figures, they were either light-skinned black guys or Mexicans, and there's the haze of the bullets going off in the room, so it wasn't a clear visual." One of the men said to Alfredson, "Don't move or I'll blow your fucking head off."

¶ 22　　　　　Alfredson recalled what he did while being shot, stating as follows:

> "I was in shock. I looked down, I seen blood coming off my shirt, and at that time my leg gave out from me, I was falling to the ground, and I knew that was it, I needed to get some protection. I had—my .45 was in my coffee table drawer there. I proceeded to try to get that out as best I could, but I couldn't get [to] the door, couldn't get my coffee table moved because my leg was gone, I had no movement in it, so I had to push it with my arm."

¶ 23　　　　　However, before he could get to his gun, he was shot "point blank" in the head. Eventually, after "a struggle" with one of the men, Alfredson managed to grab his gun from the

coffee table, unholster it, and fire one shot. His gun then jammed, and the men "went running." Alfredson dragged himself to the kitchen to reach his telephone and called 911. A recording of that call was then played for the jury.

¶ 24　　　　　During the 911 call, Alfredson told the dispatcher that he had been shot and robbed and that he was "dying." He told the dispatcher that he did not know who shot him. He described the assailants as "two Mexican young kids." He reported that they were both armed. He repeated that he was "dying," and when the dispatcher asked where he had been shot, he answered "all over." (We note that Alfredson had been shot a total of five times: (1) once in the face, (2) once in the left arm, and (3) three times in his torso.)

¶ 25　　　　　During the call, Alfredson repeatedly asked for the dispatcher to send help. His voice sounded more distant at times, and the dispatcher said his name to get him to respond to her.

¶ 26　　　　　After the recording was played, Alfredson was asked whether he previously knew defendant. He replied, "No, ma'am, I've never seen him before in my life." When asked about a Chicago White Sox hat that the police found in his house after the shooting, Alfredson said that the hat was not in his home before he was shot.

¶ 27　　　　　　　　　　　　　　2. *Torry Regez*

¶ 28　　　　　Detective Torry Regez of the Rockford Police Department testified that he was assigned to investigate the shooting. As part of his investigation, he viewed video surveillance footage from three businesses in the area—namely, Robin Hood Muffler, Ladd Company, and a McDonald's restaurant—which was played for the jury.

¶ 29　　　　　Regez was asked whether he could hear from the Robin Hood Muffler surveillance video "what sounded like one gunshot, a pause, and then five more gunshots." He

said, "Yes." Regez identified several still images taken from the McDonald's surveillance footage, which depicted a white car entering the parking lot, a woman walking into the restaurant, and a male wearing a Chicago Bulls jersey walking past the restaurant. Regez also identified several photographs that he took as part of his investigation of a white 1991 Oldsmobile Cutlass Ciera registered to defendant and Lenetra Williams.

¶ 30        In August 2009, Regez met with defendant, who told him that he was not involved in Alfredson's shooting. In May 2010, Regez again spoke with defendant, who again denied his involvement in the shooting.

¶ 31                            3. *Edward Kettner*

¶ 32        Edward Kettner testified that he had known Alfredson for about five years and he saw him two or three times per week. Around 6:30 p.m. on the day of the shooting, he helped Alfredson place a cover on his pool. Kettner described Alfredson as happy, talkative, and undistracted. To his knowledge, Alfredson did not have any problems with anyone. Kettner stayed for about 30 minutes. He did not see a white baseball cap inside Alfredson's home.

¶ 33                            4. *Lenetra Williams*

¶ 34        Lenetra Williams testified that defendant was her ex-boyfriend, whom she had dated from "about August or September of 2006, until December of 2009." On the morning of the shooting, she and defendant went grocery shopping. After exiting the grocery store, she saw two unfamiliar white men waiting at the car, and one of the men was wearing a jersey. She asked defendant who they were, and he said that they were "some associates." Williams did not ask any more questions and finished loading the groceries into the car.

¶ 35        Afterwards, at defendant's request, she drove defendant and the two men to the McDonald's on the corner of Kishwaukee and 15th Streets. (The record shows that McDonald's

was less than half a mile from Alfredson's residence.) Defendant sat in the front seat and the two men sat in the back. When they arrived, Williams remained in the car while defendant and the two men walked away. Defendant said he would be back in a couple of minutes and told her to wait for him. While waiting, Williams used McDonalds's restroom but "not even a couple minutes" later, defendant called her on her cell phone and told her to "hurry up and come pick him up right now." He sounded "excited" and was "yelling in the phone."

¶ 36     Defendant told Williams to pick him up at "Buckbee." After she turned onto the street, defendant and the two men ran to her car and got in. Defendant appeared "[f]rantic, like he was upset, *** his face was like red." She parked the car at a nearby park. Defendant and the men got out of the car and spoke for about 30 minutes. She did not hear what they were talking about but heard "lots of sirens and ambulance and fire trucks." The men left and Williams asked defendant what was wrong. Defendant said, "Don't worry about it." At some point, he told her that he had "messed up" and that things did not go right.

¶ 37     Since defendant was arrested, she had not spoken to him. However, she did receive letters from defendant. When asked whether she was familiar with his handwriting, Williams answered, "Yes." When asked whether defendant had instructed her to "do anything in regards to this case," Williams responded, "Duck and dodge the police or the State's Attorney, don't take no subpoenas and pretty much like stay in Madison with my mom."

¶ 38     Williams testified that in February 2013, she met with the prosecutor and an investigator to discuss a letter they had received from the attorney of a Winnebago County jail inmate. The State then showed Williams a letter marked as People's exhibit No. 61, and Williams acknowledged that letter as being the letter from defendant that she discussed on that date. She also recognized the handwriting as defendant's and stated that his nickname for her

was "Carmel Bear."

¶ 39                                        5. *Bobby Hare*

¶ 40           Bobby Hare, also known as "Nails," testified that he was currently an inmate in the Illinois Department of Corrections due to a burglary conviction. Hare had agreed to cooperate with the State in this case in exchange for a shortened sentence.

¶ 41           Hare testified that he was housed in the Winnebago County jail with defendant in late 2011 or early 2012. While jailed together, Hare agreed to give a woman named "Renee" a letter on defendant's behalf when he got out of jail. Defendant then borrowed a pen from Hare, wrote the letter, and handed it to him. Hare, however, was not released from jail, so he later gave the letter to his attorney.

¶ 42           That letter was admitted into evidence as People's exhibit No. 61, a portion of which was read in open court. The letter read as follows:

> "Carmel Bear, Look, if you're reading this, you holler at my guy. He knows what he's talking about, just like I do. Your phone is still off, so I can't call you, but I'll be able to contact you through Nails. They could be trying to subpoena you for a long time, and that's an extra hassle that I know you don't want to deal with. Like I told you in the other letter, all you have to do if and when you get subpoenaed, is they scared you into signing the statement. The State will ask you if you remember saying this or that, and you just have to say you don't know. Then the State will ask how come you don't know, and you tell them that you didn't write the statement, the dicks scared you into signing the statement, you told them you were in Wisconsin. The State will try and talk to you beforehand, just agree with what they say so they think you're cooperating. It

will make it easier on you. They didn't give you any deals, so it don't matter what you tell them, just trick them. You've got to trick them to beat them. I'm just trying to make this easier for you. No matter what, you're involved, you're the State's only evidence against me. Without you, they have nothing. Just let them subpoena you and act like you're cooperating and deny the statement. Nails will let you know more and reassure you. With love always."

¶ 43                                6. *Blake Aper*

¶ 44        Blake Aper testified that he was a forensic scientist for the Illinois State Police and an expert in the field of forensic biology and DNA analysis. Aper testified that he analyzed samples taken from the White Sox baseball hat, swabs from the recovered firearm, and buccal swabs from defendant and Alfredson. Aper concluded that defendant could not be excluded as a contributor to the DNA profile recovered from the hat. (We note that defendant, during his testimony, admitted to wearing the hat in Alfredson's house at the time of the shooting.)

¶ 45                                7. *Defendant*

¶ 46        Defendant acknowledged that he was convicted of unlawful use of a weapon in 2008, forgery in 2010, and burglary in 2007. Defendant testified that a mutual friend of his and Alfredson's had introduced the two so defendant could buy cannabis. At the time of the shooting, he had known Alfredson for 9 or 10 months. Alfredson sold defendant cannabis at least twice a month. Most of those transactions occurred at Alfredson's house, but because Alfredson did not like "traffic by his house," defendant would park somewhere else and walk to Alfredson's home.

¶ 47        On the day of the shooting, "around afternoon time," defendant went grocery shopping with Williams. While at the store, defendant received a call from his friend, Corey Harris, asking to hang out. Defendant told Harris to meet at his car, which was parked at the

grocery store. Harris did as defendant instructed but brought his cousin along, whom defendant did not know, because the cousin needed a ride towards "Broadway." Defendant obliged, and the group got into the car and headed in that direction. On the way, Alfredson called defendant's cellphone about three times, but defendant chose not to answer.

¶ 48     Once they arrived at Broadway, defendant told Williams, "[J]ust go to McDonald's." Williams asked why, and defendant told her "it doesn't matter." He asked the cousin if he would be alright with being dropped off at McDonald's, and the cousin said it was fine.

¶ 49     When asked why he went to McDonald's, defendant explained that Alfredson said he would call defendant to come over to his house. Defendant owed him about $600, and this was not the first time that Alfredson "blew up" his phone.

¶ 50     Defendant testified that after arriving at McDonald's, he and the two men walked towards Kishwaukee Street. The cousin split off from the group, and defendant and Harris continued walking down the alley towards Alfredson's house. When they arrived at the house, defendant knocked on the "back door." The glass storm door was shut, but the interior door was open so that defendant could see Alfredson sitting on the couch. Seeing defendant, Alfredson opened the door and invited defendant and Harris inside, remarking, "[W]ho the fuck is this?" Alfredson did not like people accompanying defendant when he came to his house. Defendant replied to Alfredson, "[H]e's all right, you've seen him before."

¶ 51     Defendant then got into an argument with Alfredson regarding the money defendant owed him. Defendant told Alfredson that he would have his money and Alfredson's contacting defendant was unnecessary. Alfredson looked at him and declared, "[I]t's my money, what, are you trying to play me, you trying to do me in? *** Why are you disrespecting me?"

¶ 52	Defendant asserted, "I'll get your money, it's not a big deal." Alfredson grabbed his handgun from the coffee table, shoved defendant against the door, and told defendant, "I know you have it. Now give me my money." Harris interjected, "[C]alm down, it's not that serious." Pointing the gun at Harris, Alfredson told him, "This ain't got nothin' to do with you."

¶ 53	Defendant grabbed for Alfredson's gun, and a struggle ensued. Defendant and Alfredson fell to the floor, causing Alfredson to release the gun, which sent it sliding across the floor. Defendant grabbed the gun and turned towards Alfredson, who was now on his side and leveling another black gun towards defendant. Alfredson fired once, missing defendant, and defendant closed his eyes and fired a round in return. He immediately heard multiple gunshots ring out but did not know from where they came. When defendant opened his eyes, he saw Harris exiting through the back door, and he followed Harris out into the alley. Defendant was still holding the gun at the time and threw it behind some bushes in the alley. As defendant ran, he called Williams to pick him up on Buckbee Street. Williams then drove the pair to a nearby park and stayed there for about 45 minutes.

¶ 54	On cross-examination, defendant acknowledged that he wrote a letter to Williams while he was in jail in an attempt to keep her from coming to court. He also acknowledged that he was wearing the White Sox hat found at Alfredson's house when he went to the house on the day of the shooting. Defendant was certain that the gun he shot at Alfredson was a .380-caliber handgun.

¶ 55	Defendant acknowledged that when he met with a detective in August 2009, he denied any involvement in the shooting.

¶ 56	D. Jury Instructions

¶ 57	1. *The Agreed-Upon Instructions and the Court's Given Instructions*

¶ 58       At the jury instruction conference, the trial court indicated to the parties that it would instruct the jury on, among other things, (1) Illinois Pattern Jury Instructions, Criminal, No. 3.13 (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 3.13), which limits the use of defendant's prior convictions for credibility, (2) IPI Criminal Nos. 24-25.06, which describes when a person is justified in the use of force likely to cause death or great bodily harm in defense of self, (3) IPI Criminal No. 11.53, which defines home invasion, and (4) modified IPI Criminal No. 6.07X, which includes the proposition that for a defendant to be guilty of attempted murder, the State has to prove beyond a reasonable doubt that the defendant was not justified in his use of force.

¶ 59       The trial court instructed the jury largely consistent with the discussion at the jury instruction conference. However, once the jury retired to consider its verdict, the State and defendant alerted the court that three of the instructions that the court had read to the jury were deficient—namely, instructions corresponding to IPI Criminal No. 26.01 (the general concluding instruction) and IPI Criminal No. 28.04 (the firearm enhancement instructions for home invasion and attempted murder). The deficient IPI Criminal No. 26.01 instruction contained typos in which the instruction provided "the offense of is charged," when it should have provided the name of the offense. The deficient IPI Criminal No. 28.04 instructions provided "armed with a firearm," when they should have provided "armed with a firearm and personally discharged a firearm." The court then recalled the jury and read the correct instructions.

¶ 60              2. *The Common Law Record on Appeal*

¶ 61       Given that one of the issues in this case involves a discrepancy between the report of proceedings and the common law record, we set forth those portions of the common law record necessary to address that issue.

¶ 62       The common law record contains groups of documents titled "People's Instructions," "Defendant's Instructions," "Jury Instructions Given," and "Withdrawn or Refused Instructions." The pages of jury instructions in the section "Jury Instructions Given," are devoid of markings indicating their source in the Illinois Pattern Instructions or by whom the instruction was offered. The section includes 20 jury instructions and 16 unsigned jury verdict forms. The signed "guilty" and "proven" forms appear in another volume of the record.

¶ 63       The "Jury Instructions Given" section does not include many of the parties' agreed-upon instructions, including (1) IPI No. Criminal No. 11.53, the instruction on the definition and elements of home invasion, (2) IPI Criminal No. 3.13, which directs a jury to use evidence of the defendant's prior conviction only as it may affect credibility, and (3) the State's version of IPI Criminal No. 6.07X, which included IPI Criminal Nos. 24-25.06, instructing that to find defendant guilty of attempted murder, the State must prove beyond a reasonable doubt that defendant was not justified in his use of force.

¶ 64       That section in the common law record also includes several instructions that were not agreed to be given to the jury and were not read to the jury according to the trial transcripts.

¶ 65                              3. *The Verdict*

¶ 66       The jury found defendant guilty of attempted first degree murder, home invasion, and aggravated battery with a firearm. The jury also found that defendant personally discharged a firearm in committing the home invasion and attempted murder offenses.

¶ 67                         E. Posttrial Proceedings

¶ 68       In December 2013, defendant *pro se* filed a motion for a new trial, raising claims of ineffective assistance of counsel, which the trial court denied. The court sentenced defendant

to 30 years in prison for attempted murder, along with a consecutive 20-year mandatory firearm enhancement because the jury found that defendant personally discharged a firearm during the commission of the offense. The court also imposed a consecutive 20-year prison term for the offense of home invasion, for a total aggregate sentence of 70 years in prison.

¶ 69        On direct appeal, defendant argued that the jury received improper written instructions and that the trial court should have held a preliminary *Krankel* hearing (see *Krankel*, 102 Ill. 2d at 187-89) to determine whether counsel should have been appointed in response to defendant's posttrial claims of ineffective assistance of counsel. In 2016, the Second District remanded defendant's case for a *Krankel* hearing without addressing defendant's jury instruction claim. *Jensen*, 2016 IL App (2d) 131348-U, ¶ 22.

¶ 70                                    F. The Proceedings on Remand

¶ 71        On remand, the trial court appointed new counsel to represent defendant. In June 2020, counsel filed a supplemental motion for a new trial, alleging that defendant's trial counsel provided ineffective assistance by failing (1) to object to the admission of the 911 call from Alfredson, which defendant's new counsel alleged aroused unfair sympathy from the jury, (2) to object to the State's motion *in limine* seeking to bar evidence of Alfredson's prior domestic violence incident, and (3) to investigate Alfredson's ex-wife regarding Alfredson's selling cannabis and committing domestic violence. In addition, defendant alleged that trial counsel had a prolonged and sustained medical condition that affected his representation of defendant.

¶ 72        In August 2021, defendant's appointed postconviction counsel withdrew and was replaced by new counsel, who adopted the previous motion.

¶ 73        In February 2022, the trial court conducted a hearing on the motion for a new trial. At the hearing, trial counsel testified that at the time of the hearing on the State's motion

*in limine* regarding the 911 call, he had not yet listened to the recording before he stated he had no objection to its admission, but he had reviewed a synopsis of the phone call in the police report. Later, before trial, trial counsel and defendant had listened to the call and watched the McDonald's surveillance footage together. Trial counsel believed that the 911 call was helpful to defendant's case because Alfredson told the 911 dispatch that two "young Mexicans" had committed the shooting and defendant was not black or Hispanic.

¶ 74     Defendant testified that when the 911 call was played during the trial, the jurors were "tearing up" and looked "shocked" and "horrified." He denied trial counsel's claim that they listened to the 911 call together prior to trial.

¶ 75     Regarding the potential *Lynch* material (see *People v. Lynch*, 104 Ill. 2d 194, 470 N.E.2d 1018 (1984)), trial counsel testified that all of Alfredson's prior convictions for domestic violence were not "applicable for *** *Lynch*" because of their age, with the most recent conviction being in 1982. However, he stated, "I believe I did get out that [Alfredson] had a domestic against his wife."

¶ 76     Defendant testified that he told trial counsel that he met Alfredson's ex-wife in 2007, when she separated from Alfredson and moved into the lower floor of the two-story house in which defendant was renting the upper floor. Defendant told counsel that the ex-wife was "all beat up" and "had casts on her" and said that her husband did it to her. He stopped buying cannabis from Alfredson for a while but eventually went back because Alfredson had the "good" cannabis. Defendant thought the ex-wife would be a good witness to show Alfredson's nature and that defendant knew "his type of character" and knew how to react to what he was doing.

¶ 77     The trial court issued a detailed written order denying the motion for a new trial and finding that "all of the claims set forth in that motion are frivolous and patently without

merit." The court found trial counsel credible. Regarding the failure to object to the admission of the 911 call, the court noted that (1) trial counsel wanted the call admitted and (2) the call was likely admissible under the excited utterance exception.

¶ 78　　　　　Regarding the admission of potential *Lynch* material, the trial court observed that "[trial counsel's] decision not to purse or attempt to introduce ***Lynch* material did not affirmatively prejudice [defendant]," noting that trial counsel testified that defendant told him that he "did not know *** Alfredson or anything about *** Alfredson's criminal history prior to being charged."

¶ 79　　　　　This appeal followed.

¶ 80　　　　　　　　　　　　　　　II. ANALYSIS

¶ 81　　　　　Defendant appeals, arguing that (1) he was denied a fair trial because the jury did not receive the correct written jury instructions and (2) trial counsel provided ineffective assistance by failing to (a) object to a "highly prejudicial" 911 call made by the victim, (b) present evidence that defendant was aware of the victim's history of violence, and (c) object to the admission of defendant's prior unlawful use of a weapon conviction for impeachment purposes. We disagree and affirm.

¶ 82　　　　　　　　　　　　　　A. Jury Instructions

¶ 83　　　　　As an initial matter, both parties concede and the record shows that (1) the written jury instructions in the common law record entitled "Jury Instructions Given" are deficient—for example, the definition of home invasion is missing and instructions that the parties had agreed not to give are included—and (2) the trial court's oral instructions were correct.

¶ 84　　　　　Where the parties disagree is how we ought to interpret that discrepancy. Defendant contends that the common law record reflects the whole of the written jury

instructions that the jury received at trial, meaning that we should presume written instructions not appearing in the common law record were not given to the jury to assist it during deliberations. As such, according to defendant, the trial court's failure to give the jury key written instructions was an error requiring us to remand this case for a new trial.

¶ 85    On the other hand, the State argues that the most likely conclusion is that the report of proceedings, which contains a transcript of the trial court's reading of the instructions to the jury, demonstrates that the instructions the court read to the jury were also physically provided to the jury after they were read to assist the jury in its deliberations. The State contends, therefore, that the only error occurred in compiling the record. We agree with the State.

¶ 86                                    1. *The Applicable Law*

¶ 87    "Except as otherwise provided in these rules, instructions in criminal cases shall be tendered, settled, and given in accordance with section 2-1107 of the Code of Civil Procedure, but substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). Section 2-1107 of the Code of Civil Procedure requires as follows:

> "The original written instructions given by the court to the jury shall be taken by the jury to the jury room, and shall be returned by the jury with its verdict into court. The originals and copies of all instructions, whether given, modified or refused, shall be filed as a part of the proceedings in the cause." 735 ILCS 5/2-1107(b) (West 2012).

¶ 88    Appellate courts "look at the record as a whole to resolve *** inconsistencies" between the common law record and the report of proceedings. *People v. Durr*, 215 Ill. 2d 283, 306, 830 N.E.2d 527, 540 (2005). In cases regarding jury instructions, we must presume that the

trial court provided the jury with the appropriate written instructions, giving precedence to the report of proceedings. *Id.*; see *People v. Lane*, 2011 IL App (3d) 080858, ¶ 24, 951 N.E.2d 1279, *abrogated on other grounds by People v. Bailey*, 2014 IL 115459, 4 N.E.3d 474 ("When a conflict exists between the common-law record and the report of proceedings, a court must give the report of proceedings precedence."); *People v. Jimerson*, 404 Ill. App. 3d 621, 634, 936 N.E.2d 749, 761 (2010) ("We also must start with the presumption that the trial court acted correctly in a situation such as the instant issue."); *People v. Martinez*, 361 Ill. App. 3d 424, 427, 837 N.E.2d 479, 481 (2005) ("It is only where a conflict exists between the common-law record and the reports of proceedings that we may find it necessary to give the reports of proceedings precedence." (Emphasis omitted.)); *People v. Ramirez*, 344 Ill. App. 3d 296, 300, 800 N.E.2d 844, 846 (2003) ("When there is a conflict between the report of proceedings and the common-law record, the report of proceedings prevails.").

¶ 89                                              2. *This Case*

¶ 90        We agree with the State that this case is similar to *Durr*. In that case, "the common law record contain[ed] written verdict forms mirroring those read to the jury by the trial court, and alternate written versions, using the language 'not guilty of predatory criminal sexual assault of a child.' " *Durr*, 215 Ill. 2d at 305. The alternate forms were marked " 'given, no objection.' " *Id*. Because the transcript showed that the trial court had read the correct verdict forms to the jury and the record did not otherwise show that the jury actually received the alternate verdict forms, the supreme court concluded that it was "evident" the alternate verdict forms "were mistakenly marked 'given' during the instructions conference and were not read or submitted to the jury." *Id.* at 306.

¶ 91        Here, just as in *Durr*, the common law record contains jury instructions labeled as

"given" that were not read to the jury. And, just as in *Durr*, the instructions that were read to the jury were the correct instructions agreed to be given to the jury by the parties.

¶ 92    We note that defendant argues in his reply brief that this case is different from *Durr* in that the scale of the flawed common law record is greater here than in that case. And because of that difference, the "extensive level of error is much more difficult to explain away as merely an error in properly compiling the common law record." However, we find the opposite inference more compelling—that is, given the noticeably large number of misplaced and absent documents, the record was simply improperly compiled.

¶ 93    Nonetheless, defendant argues that the report of proceedings supports his argument that the trial court did not give the jury the correct written instructions, highlighting statements of "confusion" by the trial court regarding jury instructions. He points out that the trial court, after reading the verdict instructions to the jury, acknowledged that the wording of several of the instructions was incorrect and had to call the jury back to the courtroom to reread the corrected instructions. In addition, he points to cross-talk in the court room regarding the printing of "clean" instructions and "dirty" instructions as evidence that the error occurred at trial rather than in compiling the record. We disagree.

¶ 94    First, many of the trial court's statements were made during a jury instruction conference at which the parties finalized the precise instructions that were to be given to the jury. Second, the parties' attorneys were active in ensuring the jury received the correct instructions, as demonstrated by their prompt identification of the court's mistake in reading the three incorrectly worded instructions. And the court promptly corrected the error by reading the correct instructions to the jury. Last, although one of the missing instructions from the common law record concerned the definition of home invasion, that offense is referred to throughout the

other written instructions, and the jury sent no notes indicating that they were confused about the definition of that offense.

¶ 95       In short, the trial transcripts show the jury was properly instructed. The errors present in the common law record are merely errors in compiling the record and nothing more. Accordingly, because defendant has failed to show that the jury was provided improper written instructions, defendant was not denied a fair trial.

¶ 96       Despite our conclusion that the jury was properly instructed, we think this case serves as a reminder that a trial court bears the primary responsibility to ensure that the jury receives during deliberations only those exhibits and instructions that the court has directed should be given to the jury. Similarly, the trial court should work in concert with the circuit clerk to ensure that, after the jury has returned its verdict, the exhibits and the instructions that were in the jury room are properly accounted for and appropriately made part of the record. Again, this is primarily the trial court's responsibility. By following these steps, a trial court can ensure that the problems that arose in this case will not occur again.

¶ 97                                      B. Ineffective Assistance

¶ 98       Next, defendant argues that he received ineffective assistance of counsel because trial counsel failed to (1) object to a "highly prejudicial" 911 call made by the victim, (2) present evidence that defendant was aware of the victim's history of violence, and (3) object to the admission of defendant's prior unlawful use of a weapon conviction for impeachment purposes. We disagree.

¶ 99                       1. *The Applicable Law and Standard of Review*

¶ 100       Appellate courts review claims of ineffective assistance of counsel under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v.*

*Henderson*, 2013 IL 114040, ¶ 11, 989 N.E.2d 192. To establish an ineffective assistance claim, "a defendant must show both that [(1)] counsel's performance was deficient and [(2)] that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010).

¶ 101      "Appellate review of trial counsel's performance is highly deferential. [Citation.] To establish deficient performance, a defendant must overcome the strong presumption that the challenged action or inaction may have been the result of sound trial strategy. [Citation.]" *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 93. Reviewing courts make "every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344, 309, 864 N.E.2d 196, 216 (2007). A defendant establishes prejudice by showing that, absent counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. *Gilker*, 2023 IL App (4th) 220914, ¶ 77.

¶ 102      "We review a defendant's claim of ineffective assistance of counsel in a bifurcated fashion, deferring to the trial court's findings of fact unless they are contrary to the manifest weight of the evidence, but assessing *de novo* the ultimate legal question of whether counsel was ineffective." *People v. Manoharan*, 394 Ill. App. 3d 762, 769, 916 N.E.2d 134, 141 (2009).

¶ 103                    *2. This Case*

¶ 104                    a. The 911 Call

¶ 105      Defendant argues that his trial counsel provided ineffective assistance by failing (1) to object to the State's motion *in limine*, which sought admission of the victim's 911 call or, in the alternative, (2) to seek redaction of portions of the call. Because we conclude that the

evidence of defendant's guilt was overwhelming, we need not address whether trial counsel's performance was deficient. We further conclude that, absent counsel's alleged errors, there is no reasonable probability that the result of defendant's trial would have been different.

¶ 106    The evidence at trial showed defendant (1) fled the scene of the shooting and did not contact the authorities, (2) threw the gun with which he shot Alfredson into the nearby bushes, (3) told Williams that he had "messed up" after the shooting, (4) lied to the police twice when questioned about his involvement in the shooting, and (5) actively attempted to facilitate the unavailability of a witness against him while in jail prior to trial.

¶ 107    In short, the evidence undermining defendant's credibility was so abundant that it is implausible that the graphic nature of the 911 call had any effect on the jury's credibility findings. Moreover, defendant was easily placed at the scene of the shooting based on his own testimony and the DNA evidence from the White Sox hat.

¶ 108    Put plainly, the evidence the jury heard was compelling that defendant and Harris went to Alfredson's home to intimidate him, entered the house without Alfredson's permission, fought with him, shot him multiple times, and then left.

¶ 109                b. The Victim's History of Violence

¶ 110    Defendant contends that his counsel rendered ineffective assistance by failing to present, pursuant to *Lynch*, 104 Ill. 2d 194, evidence of defendant's knowledge of the victim's violent past. Specifically, defendant contends that trial counsel should have sought the admission of evidence that defendant's knowledge of Alfredson's "violent tendencies" against his ex-wife affected defendant's perception of and reaction to Alfredson's behavior. We disagree.

¶ 111                i. Lynch *Evidence*

¶ 112    When a defendant asserts self-defense, evidence of the victim's aggressive and

violent character is relevant to show who was the aggressor. *Lynch*, 104 Ill. 2d at 200. Such evidence may support a self-defense claim by (1) showing the defendant's knowledge of the victim's aggressive and violent character affected his perception of and his reaction to the victim's actions or (2) supporting the defendant's version of events where there are conflicting accounts. *People v. Morgan*, 197 Ill. 2d 404, 454, 758 N.E.2d 813, 842 (2001) (citing *Lynch*, 104 Ill. 2d at 199-201). "The same deadly force that would be unreasonable in an altercation with a presumably peaceful citizen may be reasonable in response to similar behavior by a man of known violent and aggressive tendencies." *Lynch*, 104 Ill. 2d at 200.

¶ 113                                ii. *This Case*

¶ 114        Here, as we earlier wrote (*infra* ¶¶ 105-08), the evidence of defendant's guilt was overwhelming. Accordingly, defendant could not have been prejudiced by his trial counsel's decision to not introduce *Lynch* evidence, and his claim of ineffective assistance fails.

¶ 115        Further, although defendant's knowledge of Alfredson's alleged domestic violence against his ex-wife, in a different case, might possibly have had some evidentiary value, that claimed knowledge had no evidentiary value in this case. Defendant's testimony was that an angry Alfredson pointed a gun at him and demanded money, forcing defendant to wrestle the gun out of his hand. Moments later, Alfredson, who had supposedly just threatened defendant, leveled another gun at defendant and fired at him. In response, defendant closed his eyes and fired a shot at Alfredson from the seized gun.

¶ 116        Even assuming the jury believed defendant's version of events, Alfredson's past violent acts toward his ex-wife would have no bearing on whether defendant acted reasonably in self-defense in the context of this case (as framed by defendant)—namely, a gunfight over a drug debt.

¶ 117                    c. The Prior Unlawful Use of a Weapon Conviction

¶ 118          Defendant argues that trial counsel was ineffective for failing to (1) "specifically

object to the admission of the conviction for unlawful use of a weapon, entering only a general

objection to the admission of 'all three' prior convictions" and (2) "relitigate the *Montgomery*

issue once self-defense was raised as an affirmative defense." We disagree.

¶ 119                         i. *Illinois Rule of Evidence 609*

¶ 120          Regarding the admission of prior convictions, Illinois Rule of Evidence 609(a)

(eff. Jan. 1, 2011) provides as follows:

> "For the purpose of attacking the credibility of a witness, evidence that the
>
> witness has been convicted of a crime, except on a plea of *nolo contendere*, is
>
> admissible but only if the crime, (1) was punishable by death or imprisonment in
>
> excess of one year under the law under which the witness was convicted, or
>
> (2) involved dishonesty or false statement regardless of the punishment unless
>
> (3) , in either case, the court determines that the probative value of the evidence of
>
> the crime is substantially outweighed by the danger of unfair prejudice."

See *Montgomery*, 47 Ill. 2d at 516.

¶ 121          When conducting the balancing test, the trial court should consider relevant

factors such as "(1) the nature of the prior conviction, (2) the nearness or remoteness of that

crime to the present charge, (3) the subsequent career of the witness, (4) the length of the

witness's criminal record, and [(5)] whether the crime was similar to the one charged." *People v.*

*Wallace*, 2022 IL App (4th) 210475, ¶ 76 (citing *Montgomery*, 47 Ill. 2d at 517-18). If the court

determines that the probative value of the conviction is substantially outweighed by the danger of

unfair prejudice, then the conviction must be excluded. *Id.*

¶ 122　　　　　Generally, the decision to permit the use of a prior conviction is a matter which rests within the discretion of the trial court and will not be reversed absent an abuse of discretion. *Montgomery*, 47 Ill. 2d at 515. A court abuses its discretion by issuing a decision that is arbitrary, fanciful, or unreasonable—a decision with which no reasonable person would agree. *People v. Inman*, 2023 IL App (4th) 230864, ¶ 10.

¶ 123　　　　　　　　　　　　　ii. *This Case*

¶ 124　　　　　Here, the State's second motion *in limine* sought the admission of defendant's prior felony convictions for burglary, forgery, and unlawful use of a weapon as impeachment evidence in the event defendant testified at trial. At the hearing on the motion, trial counsel argued, "What I would ask, [Y]our Honor, is the court to *** use the balancing test and not allow all three of [defendant's] prior convictions should he, in fact, choose to testify." The trial court then stated that it was "applying the balancing test as set forth in *People vs. Montgomery*," and it found "that the probative value of the convictions *** outweigh[s] any possible prejudicial effect."

¶ 125　　　　　The above exchange clearly shows an appropriate objection by trial counsel to the State's use of the unlawful use of a weapon conviction. Additionally, regarding defendant's claim that counsel should have renewed his objection after notifying the trial court of defendant's self-defense claim, he offers no persuasive explanation as to how counsel's doing so would have changed the court's analysis.

¶ 126　　　　　Regardless, because the evidence of defendant's guilt is overwhelming, defendant cannot establish that the use of his conviction for unlawful use of a weapon for impeachment purposes prejudiced him. Accordingly, defendant's claim that his trial counsel provided ineffective assistance fails.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.